STATE of Missouri, Respondent,

v.

Tommy R. BEWLEY, Appellant.

No. 24159.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 27, 2002.

614

Emmett D. Queener, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard B. Hicks, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Chief Judge.

Following a bench trial in the Circuit Court of Mississippi County, Tommy R. Bewley ("Defendant") was convicted of two counts of statutory sodomy in the first degree, § 566.062, one count of statutory rape in the first degree, § 566.032, one count of statutory rape in the second degree, § 566.034, one count of statutory sodomy in the second degree, § 566.064, one count of child molestation in the first degree, § 566.067, two counts of endangering the welfare of a child in the first degree, § 568.045, RSMo Cum.Supp.1998, and two counts of sexual misconduct in the first degree, § 566.090.[1]

The trial court sentenced Defendant to three consecutive life sentences in the Missouri Department of Corrections for one count of statutory rape in the first degree and two counts of statutory sodomy in the first degree and imposed a consecutive sentence of ten years for child molestation in the first degree. On the remaining counts, the trial court sentenced Defendant to concurrent terms of four years for each count of sexual misconduct in the first degree and endangering the welfare of a child in the first degree, and six years for statutory rape in the second degree and statutory sodomy in the second degree. Defendant appeals, alleging four points of error, discussed below. We affirm.

A review of the facts is set out in a light most favorable to the verdict. *State v. Crawford,* 32 S.W.3d 201, 204 (Mo.App. 2000). The record reveals several inci-

dents of sexual abuse that appear to be unrelated, save for the fact that all the incidents involved Defendant. In regard to the first incident, on November 5, 1997, fourteen-year-old C.H. ran away from the Missouri Children's Baptist Home in East Prairie, Missouri.[2] As C.H. was walking down the road, a van driven by Defendant approached her, stopped, and offered her a ride, which she accepted. Defendant drove C.H. to his house and, after speaking with his wife ("Dee"), invited C.H. into their home.

Once inside, Defendant and Dee offered C.H. some beer and what C.H. believed was marijuana. After drinking and smoking with Defendant and Dee, C.H. began to feel ill. Defendant and Dee directed C.H. into their bedroom. Once there, Dee began kissing C.H. on her mouth and breasts while Defendant touched her breasts and vagina. Defendant then had sexual intercourse with C.H. until she asked him to stop. At that point, C.H. went out and slept on the couch.

The next morning, C.H. accompanied Defendant and Dee to work and helped them in their dry-wall business throughout the day. C.H. returned home with Defendant and Dee that evening and they again drank beer and smoked what C.H. described as marijuana. C.H. eventually passed out and awoke the next morning to find her pants undone. Defendant and Dee took C.H. to East Prairie and dropped her off at the Dollar General Store. C.H. walked over to the police station and advised them that she had run away. She was returned to the Missouri Children's Baptist Home.

Soon after returning, C.H. informed the director of the Baptist Home what Defen-

---

**1.** Statutory references are to RSMo 1994, unless otherwise noted.

**2.** We use initials of all the victims in this case to protect their identity.

dant and Dee had done to her the previous two evenings. The director notified police authorities and took C.H. to the hospital for an examination.

Regarding the other incidents, Judy Douglas ("Ms.Douglas"), an employee with the Division of Family Services ("D.F.S."), received a report on September 14, 1999, concerning other incidents of sexual abuse implicating Defendant. The information revealed that Defendant and Dee were "respite providers" for two young children, E.T, a young girl under the age of twelve, and A.T., a young boy under the age of ten.[3] Ms. Douglas spoke with E.T. on September 29, 1999, and E.T. informed her that Defendant and Dee had been touching her "[e]verywhere" and that this had occurred "lots of times." E.T. also related to Ms. Douglas that she and her younger brother, A.T., had "do[ne] it" while Defendant and Dee watched, and that "[Defendant] and Dee [did] it and me and [A.T.] watch[ed]."[4] E.T. further related to Ms. Douglas that Defendant was "doing it to [A.D.], and her mom and dad don't know it."[5]

On December 6, 1999, Ms. Douglas interviewed another minor, A.D., who was eight years old at the time, to follow up E.T.'s remark that Defendant had possibly molested A.D. Ms. Douglas coordinated the interview of A.D. with Deputy Roy Moore ("Deputy Moore") of the Mississippi County Sheriff's Department. A.D. informed Ms. Douglas and Deputy Moore that Defendant had "touched her" and when asked where he had touched her, "[s]he simply pointed to her chest area and

between her legs . . . ." A.D. was able to recall two specific dates when Defendant had touched her as she had recorded the first incident in her diary and could recall that Defendant had touched her two days prior to her interview, December 4, 1999. When asked if she had seen Defendant touch any other children, A.D. responded that she had seen Defendant touching E.T. A.D. also reported that Defendant had showed her movies where the people "all got in a bed together and they were touching each other" and that Defendant "had magazines there that had naked people in them."

In response to a request by Mississippi County authorities, on December 7, 1999, Karen Henry of the Polk County D.F.S. conducted an interview of A.T., who was then staying in community alternative housing in Bolivar, Missouri. Also, on January 13, 2000, Kathy Carr, a child forensic interviewer for the Child Advocacy Center, conducted an interview of A.T. During both of these interviews, A.T. confirmed that Defendant and Dee had forced him to watch the two having sex. A.T. further related that Defendant had forced him to engage in sexual relations with E.T. and forced him to kiss and lick the private parts of both Defendant and Dee. He also related that Defendant had put his penis in A.T.'s "butt." A.T. stated that when Defendant had A.T. kiss Defendant's penis that "white stuff" would come out. A.T. further recounted that Defendant threatened to kill A.T. if he refused to do these things or ever told anyone.

---

3. According to the testimony of Ms. Douglas at trial, "respite providers" are persons paid by the Department of Mental Health "to take care of mentally-challenged children, to give the parent [of these children] an opportunity to have a break. . . ." The record shows that E.T. and A.T. were both mentally challenged.

4. After Defendant was subsequently charged, E.T. testified at his trial that Defendant had sexual intercourse with her by placing his penis "inside" her.

5. A.D. was another young girl under the age of twelve, and a friend of E.T.

Based on the information he had gathered, Deputy Moore applied for and received an arrest warrant for Defendant and a search warrant for the home of Defendant. Deputy Moore executed each of the warrants and seized various items from Defendant's residence, including several pornographic videos and a pistol. Defendant was charged with the aforementioned counts involving his activities with C.H., E.T., A.T., and A.D. He was tried before the trial court and was found guilty on all counts charged.

In his first point, Defendant alleges the trial court erred in overruling his motion for acquittal on the count of statutory rape in the second degree involving C.H. because the State failed to present sufficient evidence that Defendant "inserted his penis" into C.H.'s vagina. Defendant avers that C.H. was not able to testify affirmatively that Defendant inserted his penis into her. Further, Defendant contends that C.H. was not a credible witness due to her intoxication at the time of the event and her testimony was not supported by physical evidence presented at trial.[6]

"In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable finder of fact might have found the defendant guilty beyond a reasonable doubt." *State v. Pasteur,* 9 S.W.3d 689, 697 (Mo.App.1999). The standard of review for a court-tried criminal case is the same standard used for a jury-tried criminal case. *State v. Daniels,* 18 S.W.3d 66, 67–68 (Mo.App.2000). "Substantial [or sufficient] evidence is that from which the trier of fact could reasonably find the issue in conformity with the ver-

dict." *Pasteur,* 9 S.W.3d at 697. This Court accepts as true all evidence tending to prove guilt along with all reasonable inferences that support the guilty finding while all contrary evidence and inferences are disregarded. *State v. McCarty,* 956 S.W.2d 365, 368 (Mo.App.1997).

We first observe that under section 566.034, "[a] person commits the crime of statutory rape in the second degree if being twenty-one years of age or older, he has sexual intercourse with another person who is less than seventeen years of age." Sexual intercourse is defined as "any penetration, however slight, of the female sex organ by the male sex organ, whether or not an emission results." § 566.010(4).

At trial, C.H. testified that "[Defendant] had sexual intercourse with me." When asked by the State what she meant by sexual intercourse, C.H. responded, "[w]here they put their penis in my vagina." While C.H. did testify that she did not ever see Defendant's penis, when asked on cross-examination how she knew that Defendant had put his penis inside her, C.H. replied, "[b]ecause I felt it go in." Further, C.H. related that she had knowledge and experience regarding sexual intercourse as she testified that previously another person had forced her to engage in sexual intercourse.

The testimony provided by C.H. was direct evidence of the charge of statutory rape in the second degree against Defendant. "Direct evidence is testimony as to the existence or nonexistence of an element of the crime concerning which the witness claims personal knowledge." *State v. Butler,* 951 S.W.2d 600, 604 (Mo. banc 1997). When confronted with direct

---

**6.** At trial, Defendant offered into evidence a copy of C.H.'s physical exam taken on November 7, 1997, just after C.H. reported the incident with Defendant and Dee. Results of the pelvic examination of C.H. found her external genitalia to be normal and no injuries were discovered.

evidence, the only function of the trier of fact is to weigh the credibility of the witness. *State v. Grim,* 854 S.W.2d 403, 418 (Mo. banc 1993). "Witness credibility is a matter for the trial court, and is not within the province of the appellate court in a court-tried criminal case." *Daniels,* 18 S.W.3d at 68.[7] Our review of the case is limited to a determination of whether the State introduced sufficient evidence at trial to allow a reasonable fact-finder to find each of the elements of the offenses charged beyond a reasonable doubt. *Id.*

As this Court looks only to the inferences in testimony which favor the trial court's verdict, the foregoing above evidence is probative of the fact that Defendant's penis penetrated C.H.'s vagina. *See State v. Dunn,* 7 S.W.3d 427, 430 (Mo.App.1999). While the physical findings of the medical examination of C.H. may not support her testimony of the assault, this fact standing alone does not negate the deference given by the trial court to the testimony of C.H. In our review of the record, we are convinced that the State met its burden of proof in regard to the charge of statutory rape in the second degree against C.H., as her testimony clearly established that Defendant had sexual intercourse with her. Point denied.

In his second point, Defendant maintains that the trial court plainly erred in allowing the State to ask Kathryn Blevins ("Nurse Blevins"), a woman's health care nurse practitioner, an improper hypothetical question relating to C.H., whom Nurse Blevins did not personally examine. At trial, the following exchange occurred:

State: If you had a 14–year–old girl that you were examining who had a history of sexual activity, was in the estrogenized state, I guess is the way to put it, and had alleged—had told you that she'd been intoxicated during the sexual intercourse, would you expect to find any injuries?

Defendant's counsel: Judge, I'm going to object to this. He's—[the State] is obviously asking about a person—a victim—I believe [C.H.], who this—Ms.—

Witness: Blevins.

Defendant's counsel: Blevins. I'm sorry—did not examine. And he's giving her—a lot of scenario of her. But I don't believe that she can make an educated guess without examining the person we're talking about. And I think that's what he's trying to get her to make—to say something affirmative about someone that she hasn't even examined. So I would object to that.

The Court: Response?

State: Judge, I think it's proper to give an expert witness a hypothetical. It's done all the time. And that's basically what I've done here. I'm not asking her to make any determinations about [C.H.]. She can be crossed about maybe some different things. But I just laid out a scenario here, and I think it's

---

**7.** In our review, we have found no significant contradictions or inconsistencies in C.H.'s trial testimony, which would otherwise have required corroboration of her direct testimony. *See State v. Baker,* 23 S.W.3d 702, 709 (Mo. App.2000); *State v. West,* 939 S.W.2d 399, 403 (Mo.App.1996); *State v. Kuzma,* 745 S.W.2d 700, 702 (Mo.App.1987). Although a physical examination of C.H. revealed no acute tearing or bruising, the record also shows that C.H. had previously engaged in sexual intercourse before the incident in question. As further corroboration, C.H. described the fact that Defendant had a white van with a red stripe and that she had accompanied Defendant and his wife to Charleston, where Defendant was involved in a drywall project. Chief Richard Gregory testified that Defendant had a "light colored white van, had a red stripe half way or three quarters of the way up." He also testified that Defendant was in the drywall business.

proper for her to testify as an expert about this hypothetical.

The Court: Objection overruled.

State: Given this hypothetical, would you be surprised that there were no physical findings, no physical injuries?

Witness: I wouldn't expect to find any injuries.

Defendant argues there was not competent evidence in the record to indicate that C.H. was "estrogenized," therefore the hypothetical question raised by the State was improper because it was framed on an assumption of fact not established by the evidence at trial.[8]

█ Defendant acknowledges that its trial counsel did not raise an objection to the hypothetical question posed by the State for the reasons he is now alleging in this appeal, but rather his trial counsel objected on a different basis, the fact that Nurse Blevins had not examined C.H. "If a defendant objects at trial and states one basis for the objection, he will not be allowed to change that basis on appeal. Issues raised for the first time on appeal are not preserved for review." *State v. Reynolds*, 997 S.W.2d 528, 531 (Mo.App.1999) (citation omitted). Nevertheless, Defendant seeks plain error review under Rule 30.20.[9]

█ "In order to prevail on plain error review, Defendant must show that the trial court's error so substantially violated his rights that manifest injustice or a miscarriage of justice will result if the error is not corrected." *State v. Burgess*, 28 S.W.3d 441, 443 (Mo.App.2000). "More than a mere showing of demonstrable prejudice is required as a basis for reversal

under plain error." *State v. Mathews*, 33 S.W.3d 658, 662 (Mo.App.2000).

█ While Defendant is correct in asserting that there was no evidence to establish that C.H. was experiencing her monthly menstrual cycle at the time of her assault and examination in 1997, Defendant has failed to convince us that he suffered manifest injustice or a miscarriage of justice as a result of the hypothetical question being presented at trial. There is nothing in the record to indicate that the brief testimony surrounding the hypothetical question had any bearing on the trial court's ruling. The trial court is afforded sound discretion in determining the adequacy of hypothetical questions presented during the course of a trial. *Reynolds*, 997 S.W.2d at 531. Furthermore, "[i]n a judge-tried case, we presume that the trial judge was not prejudiced by inadmissible evidence and was not influenced by it in reaching a judgment, unless it is clear from the record that the trial judge considered and relied upon the inadmissible evidence." *State v. Anders*, 975 S.W.2d 462, 466 (Mo.App.1998) (citation omitted); *see also State v. Draman*, 797 S.W.2d 575, 577 (Mo.App.1990); *State v. Harris*, 774 S.W.2d 487, 493 (Mo.App. 1989). Defendant has failed to demonstrate that the trial court relied on the evidence regarding the hypothetical question in reaching its decision. Point denied.

In his third point, Defendant asserts the trial court erred in allowing the videotaped deposition of A.T. into evidence, which had been taken outside the presence of Defendant. He maintains the State failed to prove that A.T. would suffer significant emotional or psychological trauma

---

8. The term "estrogenized" was described by Nurse Blevins as "in a female, around the time of puberty, when estrogen begins to be produced in ovaries, causes changes in the tissue ... it causes it to be—especially in the vagina, causes it to be stretchier."

9. Rule references are to Missouri Court Rules 2001.

as a precursor to having A.T. declared as an unavailable witness under section 491.680, RSMo 2000.[10]

Prior to trial, a hearing was held pursuant to section 491.680, RSMo 2000, to determine if the trial court should grant the State's motion for a video-taped deposition of A.T. The State presented evidence from Dr. Mark Glover, a psychologist who specialized in developmental psychology for children, about his examination and opinion of A.T's mental and psychological condition. Dr. Glover testified that he had been working with A.T. for approximately six months and that A.T.'s reaction to Defendant "was so negative and so violent and so disruptive on his overall well-being that I have, in my work, with him not dealt with that very much." Dr. Glover further expressed his opinion that if A.T. were to testify at trial it would cause significant emotional and psychological trauma. Afterward, the trial court found that "if [A.T.], had to testify in front of—in the personal presence of either [Defendant] or [Dee], that he would suffer significant emotional or psychological trauma by testifying in the personal presence of the Defendant." The trial court then granted the State's motion to present the video-taped deposition of A.T. at trial.

Defendant's argument centers around the fact that the trial court did not make a *specific* finding on the record that A.T. was unavailable as a witness at trial. Defendant cites *State v. Naucke*, 829 S.W.2d

445 (Mo. banc 1992), in support of his contention. In *Naucke*, the trial court was faced with a similar issue, and after considering evidence at a similar hearing made a finding that the child victim "would suffer emotional or psychological trauma if required to testify in open court, or in the personal presence of the defendant." *Id.* at 450. The trial court then related "that this trauma would in effect make the child unavailable as a witness." *Id.*

The State counters by pointing out that in section 491.680, "the question is whether [A.T.] would suffer significant trauma from having to testify in the presence of [Defendant]. If so, then [A.T.] was unavailable as a witness." Further, the State also cites to *Naucke*, which elaborates "that the trial court's finding that [victim] would suffer emotional and psychological trauma, *which would in effect make her unavailable as a witness if required to testify in the personal presence of the defendant*, satisfies the threshold requirement. . . ." *Id.* at 451 (emphasis added). We agree.

The trial court substantially complied with the requirements of section 491.680 by conducting a hearing and finding that A.T. "would suffer significant emotional or psychological trauma by testifying in the personal presence of the Defendant." Defendant's point lacks merit and is denied.

In his fourth point, Defendant contends that the trial court erred in overruling

---

10. Section 491.680, RSMo 2000, sets out, in pertinent part:

1. In any criminal prosecution under the provisions of chapter 565, 566 or 568, RSMo, involving an alleged child victim, . . . the court may order that an in-camera videotaped deposition of the testimony of the alleged child victim be made for use as substantive evidence at preliminary hearings and at trial.
2. If the court finds, at a hearing, that significant emotional or psychological trauma to the child which would result from testifying in the personal presence of the defendant exists, which makes the child unavailable as a witness at the time of the preliminary hearing or trial, the court shall order that an in-camera videotaped deposition of the testimony of the alleged child victim be made for use as substantive evidence at the preliminary hearings and at trial.

Defendant's motion to suppress evidence of an adult videotape and guns seized from Defendant's home because such items exceeded the scope of the search authorized by a search warrant obtained prior to Defendant's arrest. Defendant maintains that the admission of the foregoing items at trial violated his rights as guaranteed by the Fourth and Fourteenth Amendments to the United State Constitution as well as Articles Ten and Fifteen of the Missouri Constitution. He also asserts that he "was prejudiced by admission of this evidence because the State used it to bolster its case against [Defendant]."

As previously discussed, Deputy Moore applied for and received a search warrant to search Defendant's home prior to arresting Defendant. Included in the search warrant was a search for:

> [P]ornographic materials, such as movies/videos, magazines, and photographs and pictures depicting sexual activity of adults with children, including but not limited to acts of sodomy, sexual intercourse, or other sexual contact of the child by the adult or the adult by the child.
>
> Photographs of nude children, or nude children and adults; sexual aids and devices, Vaseline, camera equipment including camera and tripod, evidence of the crime of sexual abuse.

The search warrant did not include any mention of guns or other weapons. Upon conducting the search, Deputy Moore seized magazines, photographs and videocassettes with adult pornography, several rifles, a shotgun, and a pistol.

At trial, A.D. specifically testified, over Defendant's objection, about one videotape that she recalled Defendant showing her in which "a man with a black shirt and a girl wearing a pink slip dress and another girl wearing a pair of red pants" had their clothes off and "were doing stuff they were not supposed to." Deputy Moore testified at trial, also over Defendant's objection, about guns that were seized at Defendant's home, specifically "one Luger handgun dated 1915." Deputy Moore also related that he had reviewed videotapes he had seized at Defendant's home and found one in particular in which "[o]ne lady was wearing a pink nightgown-type top and the other lady was wearing a red—red skirt, and the gentleman was wearing black—black—like a black shirt and dark pants."

Defendant premises his argument that the videotape was unlawfully seized because the search warrant specifically referred only to pornography involving "adults and children," and the seized videotape included only adults. This is of little aid to Defendant.

■ As previously recited, the search warrant included a search for "[p]ornographic materials, such as movies/videos, magazines, and photographs and pictures depicting sexual activity of adults with children, including but not limited to acts of sodomy. . . ." This language indicates that the search warrant included a search for "pornographic materials" and then went on to describe the types of materials that may be found. Pornography is defined as "[m]aterial (such as writings, photographs, or movies) depicting sexual activity or erotic behavior in a way that is designed to arouse sexual excitement." BLACK'S LAW DICTIONARY 1181 (7th ed.1999). In reviewing the evidence and considering the testimony of A.D. and Deputy Moore, the videotape falls under this definition and was covered by the search warrant. The trial court did not err by admitting the videotape into evidence at Defendant's trial. *See State v. Johnson,* 677 S.W.2d 330, 332 (Mo.App. 1984).

Defendant's argument that guns, specifically the aforementioned Luger handgun mentioned at trial by Deputy Moore, were improperly seized from Defendant's home also lacks merit. While it is true that the search warrant did not cover a search for any guns, Defendant has failed to show this Court how he was prejudiced by their seizure and presentation to the trial court. "A defendant seeking a new trial on the basis of the admission of evidence obtained by an improper search and seizure has the burden of proving both error and prejudice in the reception of such evidence." *State v. Beishline*, 926 S.W.2d 501, 508 (Mo.App.1996). Of the guns seized, only one, the Luger handgun, was discussed at trial and then only briefly. It was neither introduced nor received into evidence. Furthermore, as previously discussed, when a judge sits as the trier of fact rather than a jury, this Court presumes that any inadmissible evidence introduced at trial is not prejudicial. *Anders*, 975 S.W.2d at 466. Given the other strong evidence against Defendant, we fail to see how he was prejudiced by the brief mention of the improperly seized handgun. Point denied.

The judgment is affirmed.

SHRUM, P.J., and MONTGOMERY, J., concurs.