**Division of Employment Security, Respondent.**

**No. WD 60756.**

Missouri Court of Appeals, Western District.

Nov. 19, 2002.

■

**In the Interest of A.T., A Minor Child.**

**J.K.T., biological mother of A.T., A Minor Child, Appellant,**

v.

**State of Missouri, Greene County Juvenile Office, Respondent.**

**No. 24900.**

Missouri Court of Appeals, Southern District, Division Two.

Nov. 21, 2002.

Earl F. Seitz, Columbia, MO, for Appellant.

Ninion S. Riley, Jefferson City, MO, for Respondent.

Before HARDWICK, P.J., ELLIS and HOLLIGER, JJ.

### ORDER

Christopher A. Hazelrigg, Hazelrigg, Roberts & Easley, Springfield, for appellant.

Bill Prince, Springfield, for respondent.

KENNETH W. SHRUM, Judge.

J.K.T. ("Mother") appeals a judgment that terminated her parental rights to A.T., her son.[1]  The court found evidence

---

1. In the same judgment, the court terminated the parental rights of A.T.'s biological father. The father does not appeal; consequently, that part of the judgment is final.

existed to support three statutory termination grounds, namely, A.T. had been (1) in foster care for at least fifteen of the most recent twenty-two months before the termination petition was filed (§ 211.447.2(1)); (2) abused or neglected (§ 211.447.4(2)(a-d)); and (3) under the juvenile court jurisdiction for a year without Mother rectifying the conditions that led to the court's assumption of jurisdiction (§ 211.447.4(3)).[2] Additionally, the court found termination of Mother's rights was in A.T.'s best interest.

Mother's appeal *does not* challenge the trial court's finding that the first termination ground existed, i.e., A.T. in foster care for the fifteen-month period prescribed in § 211.447.2(1).[3] Accordingly, we only review the part of Mother's point that claims insufficient evidence exists to support the trial court's "best interest" finding. *See M.J. v. Greene County Juvenile Office*, 66 S.W.3d 745, 748 (Mo.App. 2001).[4] Finding no merit in that claim, we affirm the judgment.

## STANDARD OF REVIEW AND STATUTORY PROVISIONS

■ The standard of review that normally attends in court-tried cases applies in parental termination litigation. *In re N.B.*, 64 S.W.3d 907, 914 (Mo.App.2002). This means we will affirm the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Id.* at 914[6].

The facts and reasonable inferences are viewed in the light most favorable to the judgment with due regard given to the trial court's determination of witness credibility. *In re A.R.*, 52 S.W.3d 625, 633[2] (Mo.App.2001).

■ Under § 211.447.5, a juvenile court is empowered to terminate a parent-child relationship "if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 3, or 4 of [§ 211.447]." *See In re J.M.*, 1 S.W.3d 599[2] (Mo.App.1999). Case law confirms what § 211.447.5 clearly states, namely, that only one statutory ground for termination need be pleaded and proven; any termination ground, however, must be proven by evidence that meets the clear, cogent, and convincing standard. *In re M.J.*, 66 S.W.3d at 748; *In re A.S.O.*, 52 S.W.3d 59, 64 (Mo.App.2001). On the other hand, the best interest ruling in a parental termination case is reviewed per the abuse of discretion standard. *In re A.S.*, 38 S.W.3d 478, 486[19] (Mo.App.2001).

## FACTS

The circuit court of Mississippi County, Missouri, held a jurisdictional hearing regarding A.T. on September 8, 1998. As a result, A.T. was adjudged to be abused and neglected. On April 20, 1999, the same court ordered A.T. "*continued* in the temporary legal and *physical* custody of the

---

**2.** All statutory references are to RSMo (2000), unless otherwise indicated.

**3.** Except for questions of subject matter jurisdiction and sufficiency of the pleadings to state a claim, "allegations of error not briefed ... shall not be considered in any civil appeal." Rule 84.13(a).

**4.** Mother's claim of error appears to challenge the sufficiency of the evidence to sup-

port the trial court's finding of abuse and neglect under § 211.447.4(2)(a-d), and the so-called "failure to rectify" ground under § 211.447.4(3). Even if her attacks on these grounds were meritorious, however, they would not compel reversal since she has not challenged the trial court's finding of the first ground (in foster care for 15 of most recent 22 months). *In re R.J.B.*, 30 S.W.3d 868, 871[5] (Mo.App.2000).

[DFS]." (Emphasis supplied.) Jurisdiction of A.T. was transferred to Greene County, Missouri, on June 14, 1999.

■ Ultimately, a deputy juvenile officer of Greene County filed a petition to terminate Mother's parental rights and alleged various grounds for termination. In part, the juvenile officer alleged A.T. had been in foster care for fifteen of the most recent twenty-two months, and termination was in A.T.'s best interest.[5] The trial court found that the evidence supported those allegations. On appeal, however, Mother has neither challenged the trial court's finding that A.T. had been in foster care for fifteen of the prior twenty-two months, nor has she provided us with a record from which we can fully review that finding *ex gratia*. *See* n. 4 and n. 5. Consequently, we limit our recital of the facts to those necessary to decide if sufficient evidence exists to support the trial court's finding that termination was in A.T.'s best interest.

Mother has an extensive history with the Division of Family Services ("DFS"). Because she was unable to protect and care for two older sons (ages 16 and 14 as of June 8, 2001), the State of Illinois took custody of them when the boys were ages four and two. As to A.T. and his sister, E.T., they were primarily raised by their maternal grandmother. As the children got older, Mother and grandmother began using "family friends," Tommy and Dee Bewley, as respite providers, and "it came to the point where [A.T.] was spending more than 90% of his time there."[6] Nearly one year after A.T. "came into the DFS system on allegations that [Mother] was not providing adequate care and supervision[,]" DFS learned the respite providers (Bewleys) had sexually, physically, mentally, and emotionally abused A.T. and his sister.[7]

Mark Bradford, a clinical psychologist who tested and evaluated A.T., determined A.T. had a full scale I.Q. of 50. His detailed report included the following:

"[A.T.'s] problem[s] are multi-determined and partially due to a lack of correct social skills and educational training as a child, combined with natural deficits that would hinder him no matter where he might be placed. To complicate those issues, it would appear this child has been neglected and sexually abused, further exacerbating his problems. It was as if his mother was mentally and emotionally unavailable for this child. . . . From our records, it appears that his mother was mentally retarded,

**5.** Another allegation was that A.T. was in "temporary . . . physical custody of the [DFS] . . . pursuant to an order in Mississippi County . . . issued on or about September 8, 1998." At trial, the court took judicial notice of the Mississippi County file and obviously relied upon it to make the § 211.447.2(1) finding of being in foster care for 15 of the most recent 22 months. We use the term "obviously" because the court found that "[t]he evidence presented indicated . . . minor child had been continuously in foster care since September 8, 1998." Mother, however, has not included the Mississippi County file as part of the record on appeal. When an exhibit is omitted from the record on appeal, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to the appellant. *In re J.M.,* 1 S.W.3d at 600; *In the Interest of C.K.G.,* 827 S.W.2d 760, 767 (Mo.App.1992).

**6.** In *State v. Bewley,* 68 S.W.3d 613, 615 (Mo. App.2002), we recounted testimony from a DFS worker explaining that "respite providers" are people paid by the Department of Mental Health "to take care of mentally-challenged children, to give the parent . . . an opportunity to have a break." *Id.* at 616, n. 3.

**7.** An account of the Bewleys' abuse of A.T. and his sister is set forth in *Bewley,* 68 S.W.3d at 616, and need not be repeated here.

unable to understand, nurture and guide this child, leaving him on his own recognizance."

Bradford also tested and evaluated Mother, and he found her full scale I.Q. score was 53. Additionally, Bradford's report regarding Mother revealed, *inter alia:*

> "Family functioning has ... contributed to her problems. It appears she was sexually abused as a child.... She seems permanently stultified, as if trapped in childhood, perhaps never having resolved these issues or perhaps accepting the abuse of children as somewhat normal. She genuinely seems unaware of the needs of children for protection and guidance in these areas, and seems at a loss to know what to do to protect children."

> ....

> "She is a highly ineffectual, concrete woman who functions more like a needy adolescent than a 33 year old adult. In fact, she appears to be developmentally stuck in early adolescence, having little insight into her own problems. She appears to lack the ability to problem solve realistically. She was lacking introspection and largely unaware of the needs of her children. She is unaware of the consequences of her behavior toward others, especially her children.... Although she may verbalize caring as evidenced by her statements about her children, she presented as functionally incapacitated in terms of providing emotional support, guidance, and nurturance for children."

Bradford's prognosis for Mother being able to care for A.T. was "very poor." He recommended that A.T. not return to Mother's care and that no counseling or services be offered "because [Mother] is not able to assimilate the materials adequately or quickly enough to qualify for a return home."

At the time of trial, A.T. was living at Home Court Advantage, a facility that specialized in care for "high-needs young men." He had been there for approximately one year. Before his placement at Home Court, A.T. had been in a special needs foster home. That placement ended when the father in the family found A.T. "on top of his daughter." Before the foster care placement, A.T. had been in Lakeland Hospital in Springfield, Missouri.

Dr. Mark Glover, a clinical psychologist who dealt with A.T. for over a year at Home Court, first saw A.T. at "Lakeland Hospital when he was younger." Glover testified that A.T. always had "extreme difficulty controlling his rage[]" and sexual impulses. He further testified that A.T.'s conduct had improved "quite a bit" from when he first saw A.T., but A.T. always regressed after Mother visited him. Glover noted that A.T. severely acted up after her visits, he would get "very agitated[,]" the visits inflamed A.T., and it "would take ... a long time to get him calmed down and under control." This regression was attributed to the fact that Mother, when visiting, talked negatively about the hospital staff and repeatedly told A.T. they were trying to take him away from her. Attempts to speak with Mother about these issues "didn't work," as she rejected requests that she not talk to A.T. in this manner. Accordingly, Dr. Glover ultimately recommended Mother's visits with A.T. be stopped. He explained, *inter alia,* that A.T.'s "history, and the appalling lack of parental supervision and appropriate parenting, predisposed me to not view her as a benefit to [A.T.]." Continuing, he testified:

> "The history of [Mother] and [A.T.] was so appalling ... that all I was interested in is can he have a relationship with her

in the present and it not continue to be disruptive.... And from the beginning ... it was [disruptive]. So, I didn't ... try to increase that relationship or make it stronger. I assumed ... it was continuing along the pattern that had been set up before ... and that his best interest was not her primary concern or ability to address."

Lisa Hart, a DFS employee who worked with children placed in foster care, had been A.T.'s caseworker for approximately sixteen months. She had attempted, albeit unsuccessfully, to counsel Mother about using appropriate topics of conversation when she visited A.T. Hart testified, although the goal initially was not to terminate Mother's parental rights, it became evident that Mother would never be able to provide A.T. with the stable, nurturing environment he needs.

In concluding that termination of Mother's parental rights to A.T. would be in his best interest, the trial court made findings on the factors listed in § 211.447.6. In part, it found there "was no evidence ... that [A.T.] had any healthy emotional ties or bonds to [Mother]" (§ 211.447.6(1)); Mother "did not consistently provide financial or in-kind support for the child" (§ 211.447.6(3)); no additional services could be offered to bring about a return of A.T. to Mother's care (§ 211.447.6(4)); and Mother was "generally involved in [A.T.'s] case to the best of her ability[,]" but her visitation with A.T. was terminated by recommendation of A.T.'s therapist.

## DISCUSSION AND DECISION

Mother's single point on appeal makes a general claim that the trial court's finding that termination was in A.T.'s best interest

was not supported by sufficient evidence. Specifically, she argues:

> "there was insufficient evidence for the Court to find clearly, cogently, and convincingly ... (4) that she failed to provide support or like kind support, (5) that there were no emotional ties and a bond between her and the child ... (7) that no additional services can be offered which could change the outcome of this matter...." [8]

Preliminarily, we note that Mother misstates our standard of review when she urges us to review the "best interest" finding under the clear, cogent, and convincing standard. We review that finding under an abuse of discretion standard. *In re A.S.O.*, 52 S.W.3d at 67; *In re A.S.*, 38 S.W.3d at 486[19]. Additionally, in part, Mother has mischaracterized the trial court's findings. Mother alleges the court found "there were *no* emotional ties or a bond" between A.T. and her. The court determined there were no *"healthy"* emotional ties or bonds[.]" (Emphasis supplied.)

■ This finding of no "healthy emotional ties" is amply supported by the record. Although A.T. told psychologists he wanted a relationship with Mother, his stated reason was that he wanted "to protect her." Glover described this relationship as A.T. acting in a "parentified role," i.e., A.T. serving the parent role and Mother being the child. He explained that such a relationship was unhealthy, destructive, and counterproductive to A.T.'s treatment. Further, there was ample evidence that Mother repeatedly sought to undermine A.T.'s well-being by adversely interfering in his therapy and treatment, and she did

**8.** In reproducing and addressing Mother's point, we have omitted certain numbered claims challenging the sufficiency of the evidence to support termination based on the "abuse or neglect" *ground* or the "failure to rectify" *ground* for the reasons previously stated.

so despite admonitions and requests that she desist. The lack of bonding between the two could also be gleaned from the description of Mother's visits with A.T., i.e., "the first 15 minutes they talked, and the rest of the time they were on the couch and looking at each other." After such visits, A.T. would become uncontrollable. The trial court did not abuse its discretion when it found no healthy ties or bonds existed between Mother and A.T.

 Mother argues that the trial court's findings that she failed to consistently support A.T. are erroneous because of the testimony that she bought him gifts. For instance, DFS employee Hart testified that Mother provided "toys, I believe, on occasion, clothes. I'm not ... real sure about clothes for [A.T.]." It was within the trial court's discretion to conclude these gifts were mere token efforts of support and attach little or no weight to such efforts. § 211.447.7; *In re B.S.B.*, 76 S.W.3d 318, 326–27 (Mo.App.2002).

 Mother's complaint that the trial court erred when it found there were no additional services that could be offered to change the outcome also lacks merit. As recounted earlier, Dr. Glover saw an adverse pattern of continuing disruption by Mother in A.T.'s treatment. This persisted despite efforts to counsel Mother and explain she needed to change her behavior. In evaluating Mother, Dr. Bradford recommended A.T. not return to Mother's care and concluded that no services could be offered Mother because she was unable to "assimilate the materials adequately or quickly enough to qualify for a return home." The trial court did not abuse its discretion in reaching its conclusion on this issue.

The trial court's decision regarding what was in A.T.'s best interest was an ultimate conclusion based on the totality of the evidence presented. *In re M.J.*, 66 S.W.3d

at 749[7]. The trial court had the duty of weighing that evidence, and it is not to be reweighed by this court. *Id.* at 749[8]. Having painstakingly reviewed this record and recounted much of the relevant evidence adduced, we conclude the trial court's judgment was supported by substantial evidence, and it was not against the weight of the evidence. Moreover, the trial court neither erroneously declared nor erroneously applied the law. Mother's point lacks merit.

The judgment of the trial court is affirmed.

PREWITT, P.J., and RAHMEYER, C.J., concur.