KENNETH W. SHRUM, Judge.
 

 T.M. (“Mother”) appeals a judgment that terminated her parental rights to A.Y.M., her daughter.
 
 [1]
 
 The juvenile court
 
 *400
 
 found evidence existed to support three statutory grounds for termination, namely, Mother abused A.Y.M. (§ 211.447.4(2)); A.Y.M. had been under the jurisdiction of the juvenile court for one year without Mother rectifying the conditions that led to the assumption of jurisdiction by the court (§ 211.447.4(3)); and Mother is unfit to be a party to the parent-child relationship (§ 211.447.4(6)).
 
 [2]
 
 The juvenile court also found termination of Mother’s rights was in the best interests of A.Y.M. In her only point relied on, Mother asserts the juvenile court abused its discretion in ruling that termination of her parental rights was in A.Y.M.’s best interests. She maintains there was no expert testimony to support that finding. We affirm the judgment.
 

 STANDARD OF REVIEW AND STATUTORY PROVISIONS
 

 A trial court’s decision to terminate parental rights is reviewed under the standards of
 
 Murphy v. Carron,
 
 536 S.W.2d 30 (Mo.banc 1976).
 
 In re S.L.J.,
 
 3 S.W.3d 902, 907 (Mo.App.1999). Thus, we will affirm the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law.
 
 Id.
 
 at 907[5]. The facts and reasonable inferences are viewed in the light most favorable to the judgment with due regard given to the trial court’s determination of witness credibility.
 
 In re A.R.,
 
 52 S.W.3d 625, 633 (Mo.App.2001).
 

 A juvenile court has statutory authority to terminate a parent-child relationship “if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent, and convincing evidence that grounds exist for termination pursuant to subsection 2, 3, or 4 of [§ 211.447].” § 211.447.5;
 
 In re J.M.,
 
 1 S.W.3d 599[2] (Mo.App.1999). The best interests prong must be proven by a preponderance of the evidence, and an appellate court reviews that ruling per an abuse of discretion standard.
 
 In re P.L.O.,
 
 131 S.W.3d 782, 788-89[7,8] (Mo. banc 2004).
 

 FACTS
 

 A.Y.M. was born on August 30, 1995, and was taken into protective custody by the Greene County Division of Family Services (“DFS”) on December 12, 2001.
 

 During the early part of 2001, Mother and A.Y.M. moved to Springfield, Missouri, from Arkansas. In March 2001, Mother met Mike Smith (“Smith”) through a dating service, and he moved into her home in June of that year. About one month later, Smith stopped having sexual relations with Mother.
 

 While Smith was in the home, A.Y.M. told Mother numerous times that Smith was sexually molesting her, but Mother “did not listen.” To illustrate, although A.Y.M. told Mother that Smith “touched” her inappropriately while bathing, Mother continued to allow Smith to take bubble baths with A.Y.M. At the termination trial, Mother claimed “there was no touching between either one of them[ ]” as she was present the entire time. When Mother was asked why she allowed a grown man to bathe with her child, she answered that A.Y.M. “wanted to take a bubble bath with him.” When questioned about A.Y.M.’s complaints about Smith, Mother replied “if she told me I could have blocked it out unwillingly.”
 

 
 *401
 
 In addition to Mother ignoring Smith’s sexual abuse of A.Y.M., she mistreated A.Y.M. in other ways. For instance, she allowed the child to look at pornographic magazines in the house. Mother often watched pornographic movies in the same room where A.Y.M. was trying to sleep. Also, A.Y.M. was allowed to get “into some of [Mother’s] box of sex toys and [A.Y.M. saw Mother] allegedly licking the dildo and putting it inside [Mother].” On another occasion, Mother took A.Y.M. to a store to purchase a “vibrator.” There was also evidence that Mother, in the presence of A.Y.M., engaged in “cyber-sex” with men over the Internet whereby “a live camera was used by the mother where she and the men could watch each other masturbate.”
 

 Ultimately, A.Y.M. developed severe behavioral problems. These included committing acts of violence, sexually acting out, exposing herself to other children, and refusing to go home. This worsened until A.Y.M. was finally placed in a hospital for troubled youths. While hospitalized, A.Y.M. began telling hospital personnel of the abuses inflicted on her. Thereon, DFS became involved and A.Y.M. was taken into protective custody.
 

 After A.Y.M. was taken from her, Mother initially refused to accept any responsibility for the child’s behavioral problems and refused to recognize that her conduct had led to DFS intervention. There was evidence that despite family counseling sessions over an approximate five-month period, Mother showed absolutely no progress; that although Mother was given extensive therapy designed to make her realize how her actions had adversely affected the child, she still could not or would not fully acknowledge she had caused A.Y.M.’s problems; and she did not alter her conduct.
 

 Specifically, DFS workers testified that Mother persistently denied being told by A.Y.M. that Smith was abusing her. Mother did so even though several other witnesses testified to the contrary. They further testified that as late as 2003, she continued to deny responsibility for A.Y.M.’s situation. This was confirmed, at least in part, by Mother’s at-trial testimony. In referring to AY.M.’s disclosure of the abuse, Mother testified: ‘You know, sometimes I wonder if
 
 I could be mad at
 
 [A.Y.M.]
 
 for what she did.”
 
 (Emphasis supplied.) Similarly, when Mother was asked at trial “if she [A.Y.M.] were to tell you [Mother] something today about someone sexually abusing her, [would you be] able to deal with it and cope with it and understand it and not put it back in the recesses of your mind,” Mother answered: “I don’t
 
 think
 
 I could bury it.” (Emphasis supplied.)
 

 There was also evidence that Mother did not stop trying to put A.Y.M. in harm’s way
 
 vis-a-vis
 
 male strangers. Thus, shortly after A.Y.M. was removed from the home, Mother met a man from Minnesota over the Internet to whom she later talked several times over the phone. The man wanted to come to Missouri to meet A.Y.M., and Mother tried to arrange that meeting. She did so by asking A.Y.M.’s therapist if she could bring the man to a counseling session so he and the child could meet. Another example of Mother’s questionable conduct was found in a therapist’s testimony that at the end of one counseling session, Mother gave A.Y.M. a “long, lingering kiss” described as “erotic.”
 

 Another witness who had worked with A.Y.M. described her as a “parentified child ... one who is expected to take care of the emotional needs of the parent, rather than the parent taking care of the ... needs of the child.” In a similar vein, A.Y.M. was described as believing she had to be a protector for Mother, i.e., holding the view that if she [A.Y.M.] were not around, something might happen to Moth
 
 *402
 
 er. As such, the bond that A.Y.M. exhibited toward Mother was seen to be one of “worry.” Based on these and other observations, A.Y.M.’s therapist concluded that the relationship between Mother and A.Y.M. was psychologically unhealthy. There was also evidence that A.Y.M. had expressed her wish to be adopted by someone.
 

 Dr. Mark Stocks, whose testimony Mother cites repeatedly to urge reversal, was a licensed psychologist who worked extensively with Mother for approximately a year and a half after A.Y.M. was taken from Mother’s custody. Although it was stipulated that Dr. Stocks was an “expert,” he was described by another expert as principally an “academic” and had never worked “in child abuse and neglect as much as” other experts who testified at the hearing. Moreover, Dr. Stocks admitted he never met nor counseled A.Y.M.
 

 As to Mother, he opined that she was “on the road” to being able to parent A.Y.M. and had the “tools” to do so, but cautioned that “whether she puts [the tools] into play or not is another issue.” When asked if Mother had made sufficient progress to parent the child, Dr. Stocks said he was only “speculating.” Even so, Dr. Stocks told the court it was his belief that Mother’s parental rights should not be terminated.
 

 He also opined that reunification would be “helpful” to A.Y.M., but did so without having met the child or having information about her psychological state. Moreover, he was never directly asked whether his recommendation against termination would be in
 
 A. Y.M.’s
 
 best interests. He did testify — without explanation or rationale— that he agreed with research that essentially found that psychologically abused children will survive better if left in the abusive environment.
 

 This appeal was lodged after the juvenile court terminated Mother’s parental rights to A.Y.M.
 

 DISCUSSION AND DECISION
 

 In her only point on appeal, Mother urges reversal of the judgment based on the expert testimony adduced at the termination hearing. We reproduce her point as follows:
 

 “The trial court erred in terminating the parental rights of [Mother] because the trial court’s finding that the termination of parental rights was in the best interests of the minor child was an abuse of discretion in that the only expert testimony heard at trial was by Dr. Stocks and Ann Conn both of whom favored reunification and not termination and that the only testimony the trial court heard favoring termination was the guardian ad litem’s impermissible hearsay statements of what expert witness Ann Conn told him outside of court between September 2, 2003 and September 11, 2003 and which contradicted her in court testimony.”
 

 From this, it appears Mother believes that a judgment terminating parental rights must be reversed unless there is “expert witness” testimony that termination will be in the child’s best interests. That simply is not the law, either via statute or by case law. It is understandable, therefore, that Mother has cited no authority to support such a proposition.
 

 What the law does provide is as follows. Once a juvenile court decides that a pleaded termination ground has been proven, it must make a “best interests” determination. § 211.477.5. As an
 
 aid
 
 in deciding best interests, the legislature, per section 211.447.6, provided a list of required findings to be made “when appropriate and applicable to the case.”
 
 [3]
 

 In re
 
 
 *403
 

 A.S.;
 
 38 S.W.3d 478, 486 (Mo.App.2001). Even so, the section 211.477.6 findings are not the only best interest considerations. This follows because “best interests” is “an ultimate conclusion based on the totality of the evidence presented.”
 
 In re A.T.,
 
 88 S.W.3d 903, 909 (Mo.App.2002).
 

 Mother’s point relied on and argument in support thereof is devoid of any reference to section 211.447.6. Mother has neither addressed nor challenged the court’s section 211.447.6 findings, nor claimed that the court’s ultimate best interests conclusion was unproven by the
 
 totality of the evidence
 
 presented. As such, she has not preserved a claim that the juvenile court made an error that materially affected “the merits of the action.”
 
 See
 
 Rule 84.13(a)-(b).
 
 [4]
 

 Even so, we have reviewed the entire record and find that the juvenile court’s best interests determination was not an abuse of discretion. This is so because it was supported by a preponderance of the evidence.
 

 The evidence showed and the court found the following: (1) the emotional tie or bond between Mother and child was unhealthy; (2) Mother maintained visitation until those visits were terminated; (3) Mother provided “some” in-Mnd support; (4) no services could be offered Mother which would bring about reunification within an ascertainable period of time; (5) Mother was not committed to the child due to her failure to make sufficient progress; and (6) Mother subjected A.Y.M. to substantial emotional and sexual abuse.
 

 None of these findings weigh in Mother’s favor. Without elaboration, suffice it to say, the evidence recounted in the “facts” portion of this opinion shows that the best interest findings numbered (1), (4), (5) and (6) are supported by a preponderance of the evidence. Repeating that evidence at this point would serve no purpose other than to unduly lengthen the opinion. Moreover, Mother’s brief does not challenge these findings as lacking essential evidentiary support.
 

 As to finding number (2) (maintaining contact), it is true Mother regularly visited A.Y.M. until her visits were terminated. However, she has only written A.Y.M. three or four letters during the extended period A.Y.M. has been in DFS custody. The suspension of visitation privileges does not excuse a parent from providing a continuing relationship with a child.
 
 B.L.B.,
 
 834 S.W.2d at 799. As in
 
 B.L.B.,
 
 Mother’s excuse, that she is not much for writing letters, is inexcusable.
 
 [5]
 

 Id.
 

 
 *404
 
 Although the court found that Mother provided some in-kind support (finding no. 3), this factor likewise does not weigh in Mother’s favor when carefully examined. Thus, the “support” evidence was nothing more than the fact Mother gave A.Y.M. “gifts and things at Christmas or [her] birthday and things like that.” As it did with the visitation issue, the juvenile court appears to have attached little to no weight to Mother’s infrequent and minimal contributions, which it was free to do. § 211.447.7.
 

 In urging reversal, Mother focuses on Dr. Stocks’ opinion that Mother’s rights should not be terminated. Essentially, Mother claims this evidence outweighs any other evidence adduced in the case. We disagree. Regardless of Dr. Stocks’ testimony, his opinion is not enough to outweigh all other evidence to the contrary. As earlier stated, a best interests determination is “an ultimate conclusion based on the
 
 totality
 
 of the evidence presented.”
 
 A.T.,
 
 88 S.W.3d at 909 (emphasis supplied).
 

 More than that, Dr. Stocks’ testimony, when carefully analyzed, reveals little more than Mother made some progress. No doubt, this was why he opined Mother was not presently ready to fully parent A.Y.M., i.e., reunification “would need to be a graduated kind of course.” In essence, there was no evidence from Dr. Stocks, nor any other source, showing when, if ever, Mother would become a fit parent. The juvenile court properly weighed this against the fact that permanency is of paramount importance in A.Y.M.’s life.
 

 Finally, we note that the court was free to disbelieve any of Dr. Stocks’ testimony, which it apparently did.
 
 In the Interest of C.L.W.,
 
 115 S.W.3d 354, 355 (Mo.App.2003). The court’s implicit rejection of Dr. Stocks’ testimony is hardly surprising given his admitted lack of “on-hands” experience and the fact that he had never met, interviewed, nor counseled A.Y.M.
 
 [6]
 

 We hold that the juvenile court did not abuse its discretion by finding that termination of Mother’s parental rights was in AY.M.’s best interests. Point denied. The judgment is affirmed.
 

 PARRISH, P.J., and BARNEY, J„ concur.
 

 [1]
 

 . In the same judgment, the court terminated the parental rights of A.Y.M.’s biological father. The father does not appeal; consequently, that part of the judgment is final.
 
 In re J.J.P.,
 
 113 S.W.3d 197, 199 n. 1 (Mo.App.2003).
 

 [2]
 

 . All statutory references are to RSMo (2000), unless otherwise indicated. The findings regarding the statutory grounds for termination have not been challenged on appeal by Mother; accordingly, we only review that part of the judgment which found that termination of Mother’s parental rights was in the best interests of A.Y.M. See
 
 In re J.L.F.,
 
 99 S.W.3d 15 (Mo.App.2003);
 
 In the Interest of B.L.B.,
 
 834 S.W.2d 795 (Mo.App.1992).
 

 [3]
 

 . The section 211.447.6(1-7) “best interest” findings at issue here are:
 

 "(1) The emotional ties to the birth parent;
 

 
 *403
 
 "(2) The extent to which the parent has maintained regular visitation or other contact with the child;
 

 “(3) The extent of payment by the parent of the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division ... ;
 

 "(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the children to the parent within an ascertainable period of time;
 

 "(5) The parent’s disinterest in or lack of commitment to the child;
 

 [[Image here]]
 

 "(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.”
 

 [4]
 

 . Rule 84.13(a) provides,
 
 inter alia,
 
 that "allegations of error not briefed ... shall not be considered in any civil appeal...." In pertinent part, Rule 84.13(b) provides that ‘‘[n]o appellate court shall reverse any judgment unless it finds.that error was committed by the trial court against the appellant materially affecting the merits of the action.”
 

 [5]
 

 . Although some letters were not delivered to A.Y.M., this is Mother’s own fault because of the inappropriate content of her writings.
 

 [6]
 

 . Mother also argues that A.Y.M.’s therapist testified that reunification might be in the child’s best interests if Mother made sufficient progress. The doctor first testified that A.Y.M. should "definitely not [be] reunited with her mother.” On cross-examination, she acknowledged that she did not know what progress Mother made in therapy. She stated that she "would look at [the progress]” and possibly reassess her opinion. Then, the GAL testified to out-of-court conversations he had with both therapists, revealing that the child’s therapist had not changed her opinion in recommending termination. This came in without objection by Mother's attorney and could properly be used by the court.
 
 See State v. Crawford,
 
 68 S.W.3d 406, 408[8] (Mo.banc 2002). Regardless, it appears that the court properly considered the testimony for what it was, i.e., the basis of the GAL’s recommendation that termination was in the child's best interests, not necessarily expert testimony by a doctor that termination was recommended; consequently, this would not provide a basis for reversible error.
 
 See In the Interest of J.A.R.,
 
 968 S.W.2d 748, 751-52 (Mo.App.1998).