113 S.W.3d 197 (2003)
In the Interest of J.J.P., Minor,
T.T.P., Appellant,
v.
The Greene County Juvenile Office, Respondent.
No. 25104.
Missouri Court of Appeals, Southern District, Division Two.
June 23, 2003.
*199 Lois M. Zerrer, Springfield, for appellant.
Bill Prince, Springfield, for respondent.
SHRUM, J.
T.T.P. ("Father") appeals a judgment that terminated his parental rights to J.J.P., his daughter.[1] The court found evidence existed to support four statutory grounds for termination. One such ground was that J.J.P. had been in foster care for at least fifteen of the most recent twenty-two months before the termination petition was filed (§ 211.447.2(1)).[2] The court also found termination of Father's rights was in J.J.P.'s best interest.
In five points relied on, Father maintains there was insufficient evidence to support the termination adjudication and the various findings related thereto; accordingly, he urges reversal of the judgment. We affirm.

STANDARD OF REVIEW AND STATUTORY PROVISIONS
The standard of review ordinarily used in court-tried cases applies to parental rights termination litigation. In re A.T., 88 S.W.3d 903, 905[1] (Mo.App.2002). This means we will affirm the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. Id. The facts and reasonable inferences are viewed in the light most favorable to the judgment with due regard given to the trial court's resolution of witness credibility. Id. at 905[2].
*200 Section 211.447.5 empowers a juvenile court to terminate a parent-child relationship "if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 3, or 4 of [section 211.447]." Case law confirms what section 211.447.5 clearly states, namely, that only one statutory ground for termination need be pleaded and proven, yet any termination ground must be proven by evidence that meets the clear, cogent, and convincing standard. In the Interest of E.L.B., 103 S.W.3d 774, 776 (Mo. banc, 84903); In re A.T., 88 S.W.3d at 905[3]. On the other hand, the best interest ruling in a parental termination case is reviewed per the abuse of discretion standard. Id.

FACTS
J.J.P. was born August 21, 1998. Prior to J.J.P.'s birth, her sister, T.P., had been removed from the family home and placed in foster care due to abuse and neglect. The day before J.J.P. was born, Brandy Henson, a Division of Family Services ("DFS") case worker, recommended that upon her birth, J.J.P. should immediately be placed in protective custody. Henson's concern was that discharge of a new-born infant into Father's and V.F.'s custody would place the child at great risk for abuse and neglect. This was based on Father's and V.F.'s history with DFS and because "these parents ... failed to rectify the situation which caused T.P. to come into care."
The "situation" that led to Henson's recommendation included the following: Father was married in 1992 to H.B. and one daughter was born of that marriage. Father and H.B. separated five months after marriage, and Father voluntarily relinquished his parental rights to this child sometime in 1993. In February of that year, Father attempted suicide by shooting himself in the head. This left Father with some permanent physical and emotional problems.
After his attempted suicide, Father moved to Springfield where he met V.F. in the fall of 1993. They moved into a household that consisted of V.F.'s daughter and son, V.F.'s parents, and V.F.'s sister. From the beginning, Father and V.F. maintained a chaotic lifestyle, characterized by an unstable relationship, numerous moves, neglect of their children, and ongoing contact with DFS.
Ultimately, V.F. became pregnant. This prompted Father to leave V.F. because he "wasn't ready for a family." The couple had reconciled, however, by the time V.F. gave birth to their child (T.P.) in January 1995. Soon after T.P.'s first birthday, Father and V.F. again separated. During this separation, Father occasionally visited T.P. During one such visit, Father and V.F. began fighting, the police were called, marijuana was found in the trailer, and a substantiated DFS hotline call was made finding T.P. at risk due to domestic violence and drug use.
Later, Father and V.F. again reconciled. During this period of cohabitation, a hotline call to DFS was substantiated in May 1997 for lack of supervision of T.P. From the time T.P. was conceived and until she was two years old, the family lived in six different residences. Their nomadic lifestyle culminated in a move to a friend's home where fifteen people resided, including one known child molester. In July 1997, the couple again separated. Around this time, Father and V.F. were told that T.P. would be removed from the home if V.F.'s son remained in the home. This happened after the son was found sexually fondling T.P. The decision was made to voluntarily place the son in the care of *201 V.F.'s brother, a man whom V.F. accused of sexually molesting her when she was a child and a man who was allowed no contact with his own daughter due to sexual abuse. Near this same time, another of V.F.'s children was voluntarily placed in the care of V.F.'s mother, a woman whom V.F. accused of physical abuse.
In September 1997, T.P. was taken into DFS custody and ultimately a petition was filed to terminate Father's and V.F.'s parental rights to T.P. At the termination hearing on T.P., Father took no responsibility for her placement in foster care and claimed V.F.'s relatives were responsible for the DFS involvement. Although none of the children testified at T.P.'s termination hearing, there was evidence that V.F. and Father, either directly or indirectly, had subjected T.P., V.F.'s son, and V.F.'s daughter to acts of sexual abuse. On the evidence presented, the juvenile court terminated Father's parental rights to T.P. on March 10, 2000.
Based on the foregoing as well as other documentation in DFS files, J.J.P. was placed in a foster home when born and remained there continuously until the trial of this case.

DISCUSSION AND DECISION
Point I: Foster Care For Fifteen Of Most Recent Twenty-two Months
One statutory ground found to exist here is set out in section 211.447.2(1) as follows:
"2. Except as provided for in subsection 3 of this section, a petition to terminate the parental rights of the child's parent ... shall be filed by the juvenile officer or the division, or if such a petition has been filed by another party, the juvenile officer or the division shall seek to be joined as a party to the petition, when:
"(1) information available to the juvenile officer or the division establishes that the child has been in foster care for at least fifteen of the most recent twenty two months ...." (Emphasis supplied.)
Satisfaction of this one ground for termination is sufficient to terminate parental rights if termination is in the child's best interest. In re A.T., 88 S.W.3d at 905 n. 4; M.J. v. Greene County Juvenile Office, 66 S.W.3d 745, 748[5] (Mo.App.2001); In re C.N.W., 26 S.W.3d 386, 394[14] (Mo.App. 2000).
Here, Father concedes that the juvenile officer pleaded and proved the "15 of 22 month" ground for termination of his parental rights. Specifically, he states in his brief that "[t]he evidence indicated that [J.J.P.] was taken into protective custody on or about August 28, 1998 and [has] been in alternative care since that date."[3]
Even so, Father's first point maintains the trial court erred when it used the "15 of 22 month" basis to terminate his rights to J.J.P. He insists reversible error was committed "because there was not clear, cogent and convincing evidence that filing a petition for termination on the basis of the child being in custody fifteen of the most recent twenty two months was required in that the evidence showed there were compelling reasons to determine that filing the petition was not in the best interest of [J.J.P.]." To support this argument, Father points to section 211.447.3 (the "exception"), mentioned in the opening phrase of the "15 of 22 month" termination ground. In pertinent part, the "exception" reads:

*202 "3. If grounds exist for termination of parental rights pursuant to subsection 2 of this section, the juvenile officer or the division may, but is not required to, file a petition to terminate the parental rights of the child's parent ... if:
....
"(2) There exists a compelling reason for determining that filing such a petition would not be in the best interest of the child, as documented in the permanency plan which shall be made available for court review ...." (Emphasis supplied.)
Father argues that when the "15 of 22 month" termination ground and the "exception" are read together, they require something more than calendar dates to terminate his rights to J.J.P. Specifically, he argues that when the "15 of 22 month" provision is relied upon as a termination ground, there must be clear, cogent and convincing evidence presented that termination was in the child's best interest; and that, in this instance, the juvenile officer failed to present "best interest" evidence meeting that standard.
We view this argument as a valiant, albeit, futile effort by Father's lawyer to avoid the harsh consequences of the "15 of 22 month" termination ground. In his brief, Father argues that "[b]y looking at [the `exception'] it is obvious that the legislature intended to give the juvenile officer and the division leeway or discretion, when and if to file the petition to serve the best interest of the child." Assuming, arguendo, that Father correctly discerned the legislative intent behind the "exception," the fact remains that it is only implicated when a juvenile officer or DFS office tries to avoid the mandatory filing requirements of the "15 of 22 month" ground or any other termination grounds listed in section 211.447.2(1). If a juvenile officer or DFS office does not file or join a suit to terminate parental rights when the "15 of 22 month" termination ground exists, such entity can justify the refusal by showing the existence of the "exception" or any other situation described in section 211.477.3(1-3). Those are not the facts of this case.
In this case, the juvenile officer sued to terminate Father's rights to J.J.P. and never invoked the section 211.477.3(1-3) exceptions. Consequently, we need not decide what standard of proof attends for a "best interest" analysis under the "exception." As with any termination of parental rights case, the primary concern here is the best interest of J.J.P. In re M.E.W., 729 S.W.2d 194, 195[1] (Mo.1987). However, the correct procedure, which the trial court followed, was to address the best interest issue after deciding one or more of the statutory grounds for termination existed. In re A.M.C., 983 S.W.2d 635, 637 (Mo.App.1999); In the Interest of M.H., 859 S.W.2d 888, 896 [15] (Mo.App. 1993). Contrary to Father's argument, a "best interest" analysis was not an element of the "15 of 22 month" termination ground. The trial court's finding that J.J.P. had been in foster care for fifteen of the most recent twenty-two months was supported by clear, cogent, and convincing evidence. That finding, standing alone, was a sufficient ground to order termination, provided the trial court did not abuse its discretion in finding that termination was in the J.J.P.'s best interest. In re A.T., 88 S.W.3d at 905 n. 5; M.J., 66 S.W.3d at 748[5]; In re C.N.W., 26 S.W.3d at 394 [14]. We reject Father's argument to the contrary. Point I is denied.[4] *203 Point V: Best Interest Determination
If a juvenile court decides that a pleaded termination ground has been proven, it must make a "best interest" determination. § 211.477.5. As an aid in deciding best interest, the legislature, via section 211.447.6, provided a list of required findings to be made "when appropriate and applicable to the case."[5]In re A.S., 38 S.W.3d 478, 486 (Mo.App.2001). The section 211.477.6 findings, however, are not the only best interest considerations. This follows because "best interest" is "an ultimate conclusion based on the totality of the evidence presented." In re A.T., 88 S.W.3d at 909.
Section 211.477.6 leaves it to the trial court's discretion to make findings on the factors it deems applicable. In re A.S., 38 S.W.3d at 487. Here, the court made findings on five factors, as follows:
"(a) [T]he minor child was removed at birth and never resided with the ... father. Tessa Brown [DFS worker] reported that the minor child had a bond with her foster placement.
"(b) ... The father maintained consistent visitation....
"(c) [Father] provided regular in-kind support and some financial support for the minor child.
"(d) ... There are no services, which could be ... offered which would enable a placement of the child with the father... in an ascertainable period of time. The evidence indicated that [Father] had for a number of years been offered significant and intensive services, none of which placed [Father] in a position to provide appropriate care for the child.
"(e) The father [has] shown an interest in but [has] demonstrated a lack of commitment to the minor child as evidence[d] by failing to take responsibility for the child coming into and remaining in foster care, and failing to adjust [his] circumstances to provide an appropriate home for the child."
Father's fifth point maintains the trial court erred in ordering termination of Father's parental rights to J.J.P. because the trial court's findings and evaluation of the factors enumerated in section 211.447.6 were against the weight of the evidence. Specifically, Father asserts that, contrary to the court's findings,
"the evidence showed that: 1) the child had emotional ties to [Father], 2) [Father] maintained regular contact and visitation with [J.J.P.], 3) [Father] did provide financial and in-kind support as he was financially able, 4) [Father] was making progress toward lasting parental adjustment through services provided to him and additional service would likely bring about that adjustment enabling [J.J.P.] to return to [Father's] care, and 5)[F]ather took an active interest in and *204 was committed to [J.J.P.] and involved in her case."
First, there is evidence that J.J.P. had modest emotional ties to Father. The trial court did not find otherwise. That does not preclude a finding, however, that the best interest of J.J.P. would be served by termination. See, e.g., In re A.S., 38 S.W.3d at 487, n. 6. In analyzing the "emotional tie" factor, it is appropriate to consider how long a child has been in foster care, how the child fared during that period, the amount and quality of the parent's visitation during foster care, the child's emotional ties to his or her foster family or prospective adoptive family, and the extent to which the child has had a continuing, healthy, and stable foster care situation. In the Interest of B.A., 931 S.W.2d 926, 930 (Mo.App.1996); In the Interest of S.H., 915 S.W.2d 399, 405-06 (Mo.App.1996); In the Interest of M.B., 768 S.W.2d 95, 97 (Mo.App.1988).
Here, uncontradicted evidence supports the trial court's finding that J.J.P. had never lived with Father, and that J.J.P. "had a bond with her foster placement." Evidence also showed that J.J.P. had continuously lived with foster parent L.W. from the day she was born. L.W. characterized J.J.P. as "headstrong" about some things, such as food, but nothing major; that she was "usually pretty easygoing." She described J.J.P. as healthy. As to other children in the foster family, J.J.P. related "very well" to them and considered them as her "brothers and sisters." J.J.P. referred to L.W. as "mama Lisa." Overall, the evidence showed J.J.P. had a attachment to L.W. and had a continuing, healthy, and stable foster care situation where she had developed into a "very bright, charming little girl[,][s]trong willed at times[,][g]enerally mischievous[,]" but "[v]ery good ... [t]ypical child."[6]
On the other hand, Father's only contact with J.J.P. has been through supervised visits that originated at the DFS office and were limited in scope, i.e., two hours per week since August 2001, and two hours every other week before August 2001. With a single exception, J.J.P. never manifested problems when separating from Father after visits.[7] In sum, the record showed J.J.P. had some emotional ties with Father, yet, the totality of the evidence was sufficient to show that J.J.P.'s emotional ties to Father were weaker than to her foster family. See In re S.L.N., 8 S.W.3d 916, 926-27[17] (Mo.App.2000).
Father also complains that the trial court's finding about his contact and visitation with J.J.P. was against the weight of evidence. We note, however, that the court found "[F]ather maintained consistent visitation." The record supported such a finding, and this finding weighed in Father's favor; consequently, this complaint is illogical.
We are equally hard pressed to understand Father's next complaint, namely that the court's section 211.447.6 best interest finding about support for J.J.P. was against the weight of the evidence. The court found Father provided regular in-kind support and some financial support for the minor child. The evidence supported that finding, but nothing else favorable to Father's position. By his own admission, he had not provided continuous financial support for J.J.P., even when he was fully employed, able financially to do so, and under an order from the Division *205 of Child Support Enforcement to make a regular support payment. Specifically, Father conceded he had full-time continuous employment (40 hours per week with some overtime) from July 2001 through trial date (January 23, 2002) from which he earned $8.02 per hour. He paid nothing, however, on his child support obligation after January 2001. During that period, Father stayed with friends so that his rent was only $200 per month, plus he helped "out with food." He presented no evidence of other expenses; consequently, his claim on appeal that he provided financial support to the extent he was "financially able" rings hollow.
Equally unavailing is Father's claim that he was trying to be "frugal" so he could provide J.J.P. with independent housing should he be awarded custody of her. A parent's duty to provide support does not abate while the child is in DFS's custody, and a parent is obligated to provide support even in the absence of demand by DFS for such payment. In re A.H., 9 S.W.3d 56, 60[6] (Mo.App.2000). The totality of evidence on this factor supports the view that termination was in J.J.P.'s best interest.
Regarding Father's fourth complaint, i.e., that the trial court erred when it found no services were available that would aid in achieving placement of J.J.P. with Father in the ascertainable future, we note he has left this argument largely undeveloped. Even so, we have gratuitously and carefully examined the record and find that Father has been involved with DFS since 1996. From then and until trial, Father was provided with a multitude of services designed to aid in adjusting his circumstances and life style sufficiently to permit permanent placement of J.J.P with him. Not one of the witnesses called by Father (which included his sister, a counselor and four DFS workers) testified he was prepared, as of trial date, to have J.J.P. in his custody on a continuing, permanent basis. For instance, when Father's sister was asked if he was in a position to raise a young child by himself, she answered: "[H]e's definitely come a long way since his first child was born[,]" but "he's still got some obstacles to overcome." Although several DFS workers called as witnesses by Father expressed the opinion he had been more than compliant with his treatment plan and was "getting it," they acknowledged that the following did not constitute compliance: (1) His failure to provide support; (2) his involvement with law enforcement concerning marijuana and drug related charges; and (3) his ongoing failure to provide an appropriate and stable residence.
Based on what DFS workers characterized as progress by Father in his treatment plan, they recommended Father be given unsupervised visits with J.J.P. The juvenile office and J.J.P.'s guardian, however, opposed such visits; thus, such visitations were never allowed. Once the DFS office failed in its bid to get unsupervised visits approved by the juvenile court, the DFS office recommended termination. From the testimony of several DFS workers, it is inferable that their termination recommendation came because of DFS's belief that J.J.P.'s best interest required a permanent placement for her; that despite the progress made by Father in his treatment plan, no DFS worker was ready to recommend permanent placement with Father until unsupervised visits had occurred; and without unsupervised visits, the only permanent solution that was in J.J.P.'s best interest required that Father's parental rights be terminated. In sum, there is ample evidence to support the trial court's finding that no other services existed which would lead to placement *206 of J.J.P with Father "in an ascertainable period of time."
Finally, contrary to Father's argument, the record supports the trial court's finding that Father had shown an interest in J.J.P, but had revealed a lack of commitment to her "by failing to take responsibility for the child coming into and remaining in foster care, and failing to adjust [his] circumstances to provide an appropriate home for the child." The trial court was correct when it found Father has shown an interest in J.J.P. Even so, there was evidence suggesting that Father's self-indulgences and self-interests ranked higher with him than his interest in J.J.P.
Father continued his relationship with V.F. until September 2000 (by which time J.J.P. was over two years old) even though he recognized their relationship was "very chaotic," and the evidence clearly showed it would not have been in J.J.P.'s best interest that she be returned to them as a couple. Near that same time, i.e., August or September 2000, Father was charged with possession of marijuana and paraphernalia. This was the third time he had been caught in possession of illicit drugs. The third incident came nearly two years after J.J.P.'s birth and long after Father had agreed to treatment programs that prohibited drug usage. On one earlier occasion, marijuana was found in his house, and at another time the drug was located in his car. In November 2000, Father was photographed in his home wearing women's underwear, with his only explanation being that he did so on a "dare."
In September 2001, he was arrested for violating an order of protection issued at the behest of J.J.P.'s mother. From the many programs in which Father had participated, he had known for years that regular employment and a permanent, stable household would be in his children's best interests; however, he left a job at Wendy's in January 2001, because he felt "uncomfortable." He remained unemployed for several months. When Father finally returned to work, he did not provide financial support for J.J.P., nor did he use his earnings to establish a permanent living arrangement. Instead, he relinquished to V.F. his rights to a mobile home they owned jointly and began living with friends. At the time of trial, Father lived in a house with ten other people. Father conceded that his current living arrangement was not appropriate for J.J.P., but he had made no inquiries about different housing or day care for J.J.P. In sum, the evidence supported the view that Father had an interest in J.J.P., but was not committed enough to change his lifestyle sufficiently to provide her an appropriate home.
We are persuaded the juvenile court's finding that termination was in J.J.P.'s best interest was not an abuse of discretion, i.e., it was not "`so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration."' In re A.S., 38 S.W.3d at 487. Point V is denied.
The judgment is affirmed.
PARRISH, J., concurs.
RAHMEYER, C.J., concurs.
NOTES
[1] In the same judgment, the court terminated the parental rights of J.J.P.'s biological mother, V.F. V.F. does not appeal; consequently, that part of the judgment is final.
[2] All statutory references are to RSMo (2000), unless otherwise indicated.
[3] The petition for termination was filed October 19, 2000. By that date, J.J.P. had been in foster care over twenty-five continuous months.
[4] Because sufficient evidence supports the decision to terminate pursuant to the "15 of 22 month" termination ground, this court declines to address Father's allegations of error in Point II (abuse and/or neglect finding), Point III (failure to rectify finding); and Point IV (finding of unfitness to be a party to the parent child relationship). See In the Interest of E.L.B., 103 S.W.3d at 775.
[5] The section 211.447.6(1-7) "best interest" findings at issue here are:

"(1) The emotional ties to the birth parent;
"(2) The extent to which the parent has maintained regular visitation or other contact with the child;
"(3) The extent of payment by the parent of the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division ....;
"(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
"(5) The parent's disinterest in or lack of commitment to the child ...."
[6] The quoted phrases are Father's description of J.J.P.
[7] The exception was an instance when J.J.P. went for a visit with Father and he failed to show up. On that occasion she was crying upon her return to L.W.'s house.