**In the Interest of A.S.W.**

**No. SC 85792.**

Supreme Court of Missouri, En Banc.

July 1, 2004.

Craig G. Kallen, III, Clayton, MO, for Appellant.

Theodore R. Allen, Jr., Hillsboro, MO, for Respondent.

John S. Appelbaum, Arnold, MO, Amicus Curiae Guardian ad Litem.

RICHARD B. TEITELMAN, Judge.

A.S.W. is a minor child born to P.S.W. ("Father"). Father's parental rights were terminated on November 19, 2002, pursuant to section 211.447,[1] and he appeals.[2] Father argues that the findings of the trial court did not constitute clear, cogent and convincing evidence that grounds existed to terminate Father's parental rights pursuant to section 211.447.4(3).

After opinion by the Court of Appeals, Eastern District, the case was transferred to this Court. *Mo. Const. art. V, section 10.* The judgment is reversed.

## I. Background

A.S.W. was born on February 16, 1998. Father was A.S.W.'s primary caregiver until he suffered a head injury after falling off a ladder at work on January 11, 2000. Father was hospitalized until March 14, 2000.

Father was initially discharged to home, but it quickly became clear that he could not yet live independently. He was admitted as a resident to a head-injury-rehabilitation clinic, where he was monitored and received occupational, physical and speech therapy.

On May 21, 2001, the circuit court found that Father was unable to care for A.S.W.

---

1. All statutory references are to RSMo 2000.

2. A.S.W.'s mother's parental rights were also terminated. She did not appeal.

and awarded custody to the division of family services.

On March 13, 2002, the juvenile officer filed a petition to terminate Father's parental rights, alleging that Father had "a significant brain injury which render[ed] him incapable of providing necessary care, custody, and control of the juvenile."

In June 2002, Father was discharged from the rehabilitation clinic to live with his sister. He was instructed to have "intermittent supervision" or someone available to oversee his care.

Father attended parenting classes offered by the division of family services and successfully completed the course. The instructor noted that Father had been "a pleasant, cooperative participant and [had] been a great asset to the group."

On August 29, 2002, Father was given a psychological evaluation by James Powers, Ph.D., a licensed clinical psychologist. Dr. Powers did not observe Father with A.S.W. and limited his evaluation to an assessment of Father's psychological status. Dr. Powers administered various tests to Father and found that Father had a full scale IQ of 81. Dr. Powers assigned to Father a global assessment of functioning (GAF) score of 55. A GAF of 51–60 is defined as moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). *Diagnostic and Statistical Manual of Mental Disorders,* 34 (4th ed., Text Revision 2000).

A trial was held on October 22, 2002, concerning the termination of Father's parental rights. Dr. Powers testified to the results of his evaluation. He testified that he had "serious questions" about A.S.W.'s safety if Father was to care independently for A.S.W., but that Father could parent adequately if provided guidance and assistance. Dr. Powers' conclusions were largely hypothetical and concerning the abilities of those with Father's impairment in general.

The trial court heard the testimony of Shirley Smith, a clinical coordinator at Father's rehabilitation clinic. Smith testified to the various forms of therapy provided to Father that enabled him to be discharged from the clinic after two years. She testified that it was appropriate for Father to live at home with his sister, assuming that his sister provided intermittent supervision of various activities including parenting.

Father testified that he was living with his sister, where he was responsible for paying the bills, doing the grocery shopping, caring for the dog and cleaning the house.

Father's sister testified that she had been supervising Father when he was discharged from the clinic, but that, in her opinion, Father no longer had "any limitations at all."

## II. Trial court's findings, conclusions and judgment

On November 19, 2002, the circuit court entered its judgment and order terminating Father's parental rights, finding:

The juvenile has been subject to the jurisdiction of the juvenile court for a period of one year or longer.... The father of the juvenile, on May 21, 2001, was found to be disabled and unable to care for the juvenile.

. . . .

The father of the juvenile has a mental condition, cognitive disorder, which is permanent or such that there is no reasonable likelihood that it can be reversed and which renders the father unable to knowingly provide the juvenile the necessary care, custody, and control. As a result of such condition, the father has poor insight and judgment, has diffi-

culty with safety issues and with problem solving, would have significant difficulty in family relationships, and would have severe difficulty in parenting and would require assistance from others in parenting a majority of the time.

There is little likelihood that these conditions will be remedied at an early date so that the juvenile can be returned to a parent in the near future, or continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

Termination of parental rights ... is therefore justified under section 211.447.4(3)....[3]

In considering whether to terminate the parental rights of the parents under section 211.447(3), the court has considered the provisions of subdivisions (a), (b), (c), and (d), and finds as follows:

(a) There is no record of any service agreement being approved by the court in this cause.

(b) ... The Division offered a psychological evaluation and parenting classes to the father, but in view of his mental condition, such efforts have been unsuccessful in reuniting the child with his father.

(c) ... As more fully set forth above, the father does suffer from a mental condition which is permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the father unable to knowingly provide the child the necessary care, custody, and control.

(d) There is no evidence that [Father] suffers from any chemical dependency which prevents [Father] from consistently providing the necessary care, custody and control over the child....

In considering whether to terminate the parental rights of the parents under the aforesaid sections, the court has considered the provisions of subsection 6 of section 211.447[4] and finds as follows with respect thereto.

**3.** Section 211.447.4(3) provides for termination of parental rights if:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
> (a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
> (b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
> (c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
> (d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

**4.** Section 211.447.6 provides the following factors that are relevant to determining whether termination is in a child's "best interests":

> When considering whether to terminate the parent-child relationship pursuant to subsection 2 or 3 of this section or subdivision (1), (2), (3) or (4) of subsection 4 of this

(1) There is no evidence of any substantial emotional tie between the juvenile and [Father].

(2) . . . Prior to his visits being suspended by court order, the father did visit regularly with the juvenile.

(3) . . . The father is paying child support, but is approximately $1,000.00 in arrears.

(4) Additional services would not be likely to bring about lasting adjustment on the part of [Father] enabling a return of the juvenile to [Father] within an ascertainable period of time.

(5) . . . The father has indicated an interest in, and commitment to, the juvenile.

(6) There is no evidence that [Father] has been incarcerated for any felony offense, which is of such a nature that the juvenile will be deprived of a stable home for a period of years for that reason.

(7) There is no evidence that [Father] has committed any deliberate act that would subject this child to a substantial risk of physical or mental harm, or knew or should have known of such an act on the part of another.

. . . .

Father appeals, arguing that the findings of the trial court did not constitute clear, cogent and convincing evidence that grounds existed to terminate parental rights.

## III.  Termination of parental rights

■ Section 211.447 provides various grounds for a termination of parental rights.  A trial court must find the existence of at least one ground and that termination of parental rights is in the child's best interests.  Sec. 211.447.5; *In the Interest of E.L.B.,* 103 S.W.3d 774, 776 (Mo. banc 2003).  The state bears the burden of proof, which must be met by the presentation of substantial evidence—evidence that, if true, has probative force upon the issues.  *In the Interest of B.C.K. and K.S.P.,* 103 S.W.3d 319, 322 (Mo.App. 2003).

## IV.  Standard of review

■ In termination of parental rights cases, appellate courts defer to the trial court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. *In the Interest of M.E.W.,* 729 S.W.2d 194, 195–6 (Mo. banc 1987).  Appellate courts will review conflicting evidence in the light most favorable to the judgment of the trial

section, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

court. *Id.* Grounds for termination must be supported by "clear, cogent and convincing evidence." Sec. 211.447.5; *In the Interest of C.L.W.*, 115 S.W.3d 354, 355 (Mo.App.2003). Clear, cogent and convincing evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true. Id.

■ Because parental rights are a fundamental liberty interest, statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship. *In the Interest of K.A.W.*, 133 S.W.3d 1 (Mo. banc 2004) (No. SC 85683, decided March 30, 2004); *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984); 43 C.J.S. *Infants* sec. 40(a) (2003).

### V. Analysis

Parenting is frequently a group effort. Children are often raised with extensive help from grandparents, siblings, extended family, neighbors, day care, baby sitters, a nanny, or an array of public and private service organizations. For this reason, there is nothing in section 211.447 that allows a circuit court to terminate parental rights because, without assistance, a parent lacks the ability to care for the child. Our juvenile law anticipates that many parents will be reunited with their children once the parent and the state have worked together to build a better parenting support network. Before terminating parental rights pursuant to section 211.447.4(3), a circuit court should consider, when appropriate and applicable, "[w]hether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time." Sec. 211.447.6(4); *In the Interest of J.M.N.*, 134 S.W.3d 58 (Mo.App.2004) (No. WD63811, decided May 18, 2004) (to determine likelihood that conditions of a potentially harmful nature continue or likelihood that those conditions would be remedied at any early date, court must consider all evidence of parenting classes, treatment programs, counseling and assistance from caseworkers).

■ In this case, there is no evidence that additional services would fail or be unavailable. Shirley Smith testified that, upon discharge from the clinic, Father would be appropriately assisted by the intermittent supervision of his sister.[5] Smith clarified that such supervision would include compensation for Father's parenting deficits.

In his report, Dr. Powers concluded that it would be "inappropriate for [Father] to have primary responsibility for his son. . . . I am supportive of [Father] visiting his son with supervision. Under these circumstances his son's safety or security [is] unlikely to be in jeopardy." Dr. Powers testified that individuals at Father's level of functioning "can parent adequately," but: "They require guidance. They require assistance. These are situations where it is important for a parent with that level of intellectual skills to have contact with their own parent—maybe it's a neighbor, maybe it's a grandparent, maybe it's a counselor—with whom they can bounce off ideas, bring up issues, get some help."

---

**5.** Smith testified that by intermittent supervision, she meant "that someone is there to support the person, someone is there to oversee their care, some—that someone is readily available. It doesn't mean that they have to be there in the room with them 24 hours, but within a phone call away, or . . . several physical . . . visits [per] day."

Even if the circuit court's findings are supported by the evidence, the findings do not support termination of parental rights. The circuit court found that (1) without help, Father is unable to provide A.S.W. necessary care, custody and control; and (2) Father would require assistance from others in parenting a majority of the time. In other words, with help a majority of the time, Father would be able to parent adequately.

The circuit court did not make findings as to whether services are or could be provided to Father so that he has "assistance from others in parenting a majority of the time." Section 211.447.4(3)(b) requires the circuit court to consider and make findings on the "success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child." Instead, the circuit court's finding on this section only addressed the psychological evaluation and parenting classes. The primary problem as found by the circuit court is Father's need of significant ongoing parenting assistance. It is error to fail to consider and make findings about failed, successful or possible future efforts to satisfy that need.

Therefore, the circuit court's findings do not support a termination of Father's parental rights.[6] At the most, the circuit court's findings support a conclusion that Father should not be left without assistance in parenting his son.

## VI. Conclusion

The state failed to carry its burden to produce substantial evidence that additional services would not enable the return of A.S.W. to Father within an ascertainable period of time. The findings of the trial court did not constitute clear, cogent and convincing evidence that grounds existed to terminate parental rights.

The judgment is reversed.[7]

WHITE, C.J., WOLFF and STITH, JJ., concur.

LIMBAUGH, J., dissents in separate opinion filed.

BENTON and PRICE, JJ., concur in opinion of LIMBAUGH, J.

STEPHEN N. LIMBAUGH, JR., Judge, dissenting.

I respectfully dissent. The legal question presented is whether the trial court's termination of parental rights was supported by "clear, cogent and convincing evidence." Sec. 211.447.5, RSMo 2000. In addressing that question on appellate review, as the majority aptly notes, "appellate courts defer to the trial court's ability to judge the credibility of witnesses and

---

**6.** As the dissenting opinion notes, there was additional evidence that the juvenile officer argued supported termination on multiple grounds. Father testified that he had been incarcerated for sodomizing two of his nieces. Additionally, there was evidence that Father took a shower with A.S.W., although there was no allegation of inappropriate contact. The circuit court did not terminate Father's parental rights based upon this evidence, instead ruling that Father's parental rights were to be terminated because of the consequences of his "mental condition" caused by his accident. The additional evidence was not cited by the circuit court. Even if the evidence had been found credible and relevant by the circuit court, it would not support the circuit court's stated grounds for termination because it does not relate to the severity of Father's brain injury. Appropriately deferential appellate review must be limited to the grounds for termination as found by the circuit court.

**7.** The Court expresses its appreciation to Attorney Craig G. Kallen, III, who represented Father as appointed counsel.

will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." *In the Interest of M.E.W.*, 729 S.W.2d 194, 195–96 (Mo. banc 1987.) Furthermore, "appellate courts will review conflicting evidence in the light most favorable to the judgment of the trial court." *Id.* Though this is the correct standard of review, the majority fails to follow it. There is no deference to the trial court's superior ability to judge the credibility of witnesses, and the majority ignores, overlooks, or unduly discounts critical evidence favorable to the court's decision. The focus, instead, is on largely controverted evidence that purportedly plays against the court's decision.

The evidence supporting the trial court's decision, according to the record, is as follows:

Before A.S.W. was born, Father spent ten years in prison (on a 30–year term) for sodomizing two of his nieces, then ages 11 and 15. He is a "registered sex offender."

In January of 2000, a month before A.S.W.'s second birthday, Father suffered a head injury for which he was hospitalized until March 14, 2000. Shortly after discharge, he was admitted to an inpatient head injury rehabilitation clinic where he resided from March 2000 to June 2002. He was diagnosed with several "functional impairments," including "poor memory, poor judgment, lack of insight into his injuries, poor problem solving, [and] poor [ability with regard to personal] safety," for which he received occupational, physical and speech therapy. In May 2001, the Division of Family Services (DFS) took custody of A.S.W., pursuant to court order, upon a determination that Father was disabled due to the brain injury and Mother was "incoherent, intoxicated, and unaware of the juvenile's whereabouts." Father consented to the court's jurisdiction over

A.S.W., agreeing that the allegations were true that he was "inappropriate for care because of a disability." Father then had supervised visits with A.S.W. until February 2002, but the visits were discontinued due to "inappropriate conduct" when the DFS caseworker discovered that Father had taken showers with his young son. In January 2002, Father consented to the court-adopted permanency plan that DFS would request termination of parental rights. A petition for termination of parental rights of both parents was filed in March 2002. Mother's rights have since been terminated.

Then, in June 2002, Father was discharged from the clinic "with supervision of a family member." At the time, he was not considered to be capable of living independently, and clinic staff maintained that he needed someone with him "for his safety." This conclusion was based in part on a test administered to Father known as the "Mayo–Portland Adaptability Inventory-3", a test commonly used in the rehabilitation field to determine the degree of care that needs to be provided to a patient. This test showed that Father had a "severe problem" with "recognition of personal limitations and disabilities and how they interfere with every day activities," and projected that the problem would "interfer[e] with [his] activities 75 percent of the time or more." In addition, it was determined that he would experience "moderate stress 25 to 75 percent of the time" in cooperating with family members in running a household. In reference to his ability to rear a child, the testing indicated that he would have a "severe" problem that would require "supervision from others 75 percent of the time or more." This conclusion was made despite Father's "successful" completion of a "parenting class," as the level of success was determined only by Father "show[ing] up and

[being] attentive and not disruptive," and in fact, "everyone who takes [the parenting class] successfully completes it," according to the instructor.

In August 2002, Dr. James Powers, a clinical psychologist, conducted several more tests as part of a psychological evaluation. In relating the results at trial, he first noted that Father suffered from a "cognitive disorder," that is, a brain injury, and that the condition was permanent and would not significantly improve. He opined that due to the brain injury, Father could have difficulty in controlling his mood and was likely to exercise poor judgment and make errors in more complicated parenting decisions. He had a specific concern that Father would not know what to do in an emergency situation. He summed up his testimony in this way:

> I felt it was inappropriate for [Father] to independently care for a child ... There are questions in terms of [Father's] capability. There is a potential danger for him to make errors, to make bad decisions, to show poor judgment that could place either himself or his son in jeopardy.
>
> The results of the intellectual assessment did not indicate significant deficits, but there were deficits that raised concerns. Those concerns take on greater importance in view of the history of sexual abuse for which he was incarcerated, and it takes on greater importance in view of the incident in which he showered with his son.
>
> When I combine all those together, in my opinion it raises serious questions regarding his son's safety if [Father] had primary responsibility of his son.

At trial, which was held in October 2002, Father testified on his own behalf. He stated that his income consisted solely of workers' compensation benefits, and that he was incapable of employment. Never-theless, he expressed a desire to locate either to a residence "on Compton" in St. Louis or to a home to be built on acreage he would acquire near Salem, Missouri. He added that "as for now, I stay with my sister," but acknowledged that he was alone between 7:30 p.m. and 7:30 a.m. while she was at work. His answers to several parenting questions lacked contextual understanding. For example, when asked how he would support the child, he stated, "I was planning on supporting him by having his own toys, a swing set. I bought him a new swing set to put in the backyard. I got him a little swimming pool to put in there. And I'd gotten him a new bike." When asked whether he anticipated any problems with A.S.W. as the child matured, he responded that "it may come that he may not have a real high-paying job and bills may keep—and he may have financial trouble."

By November, at the time judgment was entered, A.S.W. had been in foster care under the jurisdiction of the juvenile court for twenty-two months, and Father had had no contact with the child for nine months. The foster parents have filed a petition for adoption.

This is ample evidence to support the court's findings as entered in the court's judgment. Under section 211.447.4(3)(c), the pleaded statutory ground for termination, it must be proved that Father suffered from "[a] mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control." Father does indeed suffer from a mental condition—a cognitive disorder/brain injury—that is permanent. According to the expert testimony, not only is he unable to provide the necessary care for his child, he

is unable to care for himself, at least without "intermittent supervision" from family members or other care givers. Indeed, as a custodial parent, he would require outside assistance 75 percent of the time. And indeed, as Dr. Powers warned, the concerns about his parenting ability "take on greater importance in view of the history of sexual abuse." And indeed, there would be "serious questions regarding his son's safety."

The majority responds to the evidence of sexual abuse by suggesting that it had nothing to do with the court's decision, nor should it have. I strongly disagree. The expert testimony of Dr. Powers, which was the primary basis for the court's decision, was grounded, in part, on the evidence of sexual abuse. Moreover, the court, as in all cases, is deemed to have considered all the relevant evidence presented. The evidence of sexual abuse was relevant here not only on the question of Father's ability to provide "necessary care, custody and control," but also on the ultimate issue to be determined in every termination case—section 211.447.6's requirement that termination is in the "best interests of the child." Finally, although the court made no express finding pertaining to the sexual abuse, it was not required to do so—the only findings required are those mandated under section 211.447.

For these reasons, I would affirm the judgment of the trial court.