In the Interest of K.A.W. and K.L.W. Children Under Seventeen Years of Age.

Greene County Juvenile Office, Petitioner–Respondent,

v.

P.A.W., Respondent–Appellant.

No. 27721.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 31, 2007.

Motion for Rehearing or Transfer Denied Feb. 15, 2007.

PHILLIP R. GARRISON, Judge.

P.A.W. ("Father") appeals the judgment of the Greene County Juvenile Court (the "Juvenile Court"), terminating his parental rights to his daughters, K.A.W. and K.L.W (collectively referred to as the "children"). Father alleges there was insufficient evidence presented to support the Juvenile Court's finding that there existed two statutory grounds for termination, pursuant to Section 211.447.4,[1] and that termination of his parental rights would serve the best interest of the children. We affirm.

Father and L.W. ("Mother") had two children during their marriage: K.A.W., a female child, born December 19, 1998, and K.L.W., a female child, born September 24, 2001. Father and Mother separated in June 2001, and the couple later divorced.

On June 3, 2002, officers from the Springfield Police Department were dispatched to Mother's residence, where the children were residing, in response to a report of infant abuse. While the officers were there, Father arrived in his pickup truck with K.A.W. standing up in the seat next to him unrestrained. At that point, Mother came out of the residence appearing to be hysterical and "pretty upset." Upon entering the house, Mother whispered to Officer Randy McDowell ("Officer McDowell") that she was afraid of Father and that he abuses her. She proceeded to show him a scar on her left knee, which she said she received when Father dragged her across the floor. She also told Officer McDowell that Father had spanked K.A.W. with a fly swatter, leaving red marks on her legs. Officer McDowell examined the children and found them to be "well fed and well cared for[.]" He did not notice any physical marks on either of the children. Mother begged Officer

---

James R. Sharp, Sharp & Bredesen, Springfield, for Appellant.

Bill Prince, Springfield, for respondent.

1. All statutory references are to RSMo (2000) unless otherwise indicated.

McDowell not to leave her and the children there with Father, so Officer McDowell took them to a shelter. While en route, Mother told Officer McDowell of further misconduct committed by Father, including allegations that he had forced Mother to have sex with other men on more than one occasion.

Based on observations made by officers at the house and because K.A.W. was allowed to ride unrestrained in Father's vehicle, Father was arrested for third degree domestic assault and second degree endangering the welfare of a child. Father was never convicted for the charge of endangering the welfare of a child.

On July 29, 2002, Ron Keys ("Keys"), an investigator with the Greene County Children's Division ("the Children's Division"), responded to a hotline call alleging that Father had hit K.A.W. with a fly-swatter. Keys met with Mother and K.A.W. at the Springfield Police Department, where he observed bruising on K.A.W.'s "right fore-leg."

Keys responded to a second hotline call on July 30, 2002, alleging unsanitary living conditions in Mother's home. Upon Keys arrival at Mother's home, he found it to be in very poor condition with a number of hygiene and safety issues. Keys told Mother that the home was unacceptable and he gave her until 5:00 p.m. that day to clean it and to alleviate certain safety concerns. When Keys returned later that day, the home was much cleaner, except for the kitchen and the bathroom. Nevertheless, as a result of what Keys had observed, a Juvenile Court conference was scheduled for the following day.

At the conference, with both Mother and Father in attendance, Father explained that Mother was his fifth wife, that he had other children, and that he had been in jail for committing several crimes, including child endangerment. At the conclusion of the conference, the children were taken into protective custody due to Mother's mental limitations in caring for and protecting the minor children, and concerns regarding allegations of Father's involvement in domestic violence and sexual misconduct.

On August 1, 2002, a petition alleging neglect and abuse was filed by the Greene County Juvenile Office ("Juvenile Office"). The petition alleged that Father had been physically abusive to Mother and children, "specifically striking them repeatedly with a fly swatter." A hearing was held on September 25, 2002, at which time the Juvenile Court found the allegations contained in the petition to be true, and the children were placed in the custody of the Division of Family Services ("DFS").

The initial goal of DFS was reunification of the children with their parents. Treatment plans were put into place by the Juvenile Court to assist Mother and Father in achieving this goal. Father's treatment plan required that he: follow the recommendations of a psychological evaluation; maintain a stable residence; not allow individuals to frequent or reside in the household who would pose a threat to the children; visit with the children a minimum of twice per month; maintain gainful legal employment and provide verification of income to DFS; not violate any federal or state laws, or municipal or county ordinances; cooperate with the DFS worker (including keeping the worker informed of any changes in employment, address or household composition); sign all requested releases of information forms; and attend and complete a parenting life skills class through the Parenting Life Skills Center.

The children remained in the custody of DFS through November 4, 2004, when the Juvenile Office filed petitions to terminate the parental rights of Mother and Father,

pursuant to Section 211.447. The Juvenile Court held hearings on August 30–31, 2005, September 2, 2005, and January 4–5, 2006. At those hearings, the Juvenile Office presented the testimony of a number of witnesses in support of its petition to terminate parental rights.

Dr. Betty Schlessing ("Dr. Schlessing"), a licensed psychologist, testified that she performed a psychological evaluation on Father. Dr. Schlessing diagnosed Father with bipolar disorder, partner relational problem, and adult anti-social behavior by self-report. She recommended psychiatric treatment, counseling and parenting skills training to assist Father with the following: feelings about his marital relationship difficulties; coping skills; domineering behaviors and self-focus; anger and impulse control; frustration tolerance; consideration of others' view points; and empathetic skills. Dr. Schlessing explained that the result of Father's evaluation revealed that he was insecure and viewed females as subordinate to males. She described Father as an individual who would look to have his needs met by subordinates such as woman and children. Dr. Schlessing explained that individuals with Father's personality are prone to domestic violence. Dr. Schlessing identified Father's possible difficulties with anger control as a risk for the children, explaining his poor impulse control may cause him to spank the children excessively. Dr. Schlessing ultimately concluded that, based upon the evaluation, Father's prognosis to parent the children would be poor.

Kate Lowery ("Lowery") was the caseworker assigned to the family from July 2002 through December 2003. Lowery testified that the initial goal was reunification of the children with Mother, and a treatment program was ordered by the Juvenile Court to assist Father as well. Lowery explained that Father did not fully comply with his treatment plan, and was not cooperative with DFS, in that: he did not follow the recommendations of Dr. Schlessing for follow-up treatment; he did not complete a sexual offender's risk assessment; he failed to provide verification of his attendance to anger management counseling; he failed to show any written verification of employment; he did not consistently provide wage verification; he failed to provide divorce decrees of his previous marriages; and he failed to obey all laws in that on two separate occasions police officers were called to his residence for domestic disturbances between Father and Beulah (Penny) Seaton ("Seaton"), his girlfriend at the time.

Kellie Coble ("Coble"), the family's caseworker from August 2004 through January 2005, testified that Father did not attend counseling while she was assigned to the case. Coble was instructed not to make home visits due to concerns regarding Father's anger issues. She explained that Father's anger issues and past aggressive behavior were barriers to his reunification with the children.

At the time of the termination hearing, Phyllis Ramos ("Ramos") was the caseworker assigned to the family. Ramos provided the following testimony regarding Father's compliance with his treatment plan: he did not complete a scheduled psychological evaluation; he failed to make himself available for three scheduled home visits; he failed to consistently provide verification of employment; he failed to maintain stable, appropriate housing; he did not maintain consistent contact with the children at all times throughout the proceedings; he failed to avoid contact with law enforcement; and he did not report incarcerations in Greene County or Camden County. Ramos expressed con-

cern regarding Father's ongoing criminal behavior.

Kathryn Boone ("Boone") provided therapy services for K.A.W., including four sessions with the parents. Boone explained that K.A.W. had a number of behavioral problems, including sexually acting out. Boone testified that Father could not be trusted to help change K.A.W.'s behavior, in part because Father was unable to grasp the level of K.A.W.'s needs.

Seaton, Father's former girlfriend, testified that during her relationship with Father, he derived most of his income from stealing. She stated that there were numerous instances of domestic violence between the two. Seaton explained that Father would awaken her during the night by shining a flashlight in her eyes, and he would then threaten to kill her by beating her with the flashlight. Seaton testified that Father had sent a videotape of her having sex with two other men to her fifteen-year-old son. Seaton also stated that she had found child pornography on Father's computer.

Evelyn Nichols ("Nichols"), the Court Appointed Special Advocate, recommended to the Juvenile Court that the parental rights of both Mother and Father be terminated. Nichols expressed concerns relating to Father's stability, anger issues, and inability to handle the children by himself.

Father's fourteen-year-old neighbor, F.W., was called as a witness by the Guardian ad Litem, and testified that she met Father, because he was a friend of her parents. F.W. explained that she and Father began exchanging letters. She said that Father had kissed her in a romantic way on several occasions, and had touched her breasts and legs.

Mother testified that during her relationship with Father, he would force her to have sex with other males while he watched. She also explained that Father subjected her and the children to domestic violence.

On April 25, 2006, the Juvenile Court terminated the parental rights of Mother and Father, finding that statutory grounds existed for termination under Sections 211.447.4(2) and 211.447.4(3), and that termination was in the children's best interest. Father appeals, challenging all three findings.[2]

Section 211.447 authorizes the termination of parental rights if the trial court finds at least one statutory ground for termination exists and that termination is in the best interest of the child. § 211.447.5; *In re C.F.C.*, 156 S.W.3d 422, 426 (Mo.App. E.D.2005). We will affirm the trial court's judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. *In re C.F.C.*, 156 S.W.3d at 426. We review conflicting evidence in the light most favorable to the judgment, deferring to the trial court's assessment of witness credibility. *Id.* Because parental rights are a fundamental liberty interest, we strictly construe statutes that provide for the termination of those rights in favor of preserving the natural parent-child relationship. *In re A.S.W.*, 137 S.W.3d 448, 453 (Mo. banc 2004).

Where the Juvenile Court finds multiple statutory grounds for termination of parental rights, in order to affirm the judgment, we need only find that one of

**2.** Mother's parental rights of the children were terminated, however, she does not appeal the termination.

the statutory bases was proven and that the termination was in the best interest of the child. *In re D.M.B.*, 178 S.W.3d 683, 686 (Mo.App. S.D.2005). Grounds for termination must be supported by clear, cogent and convincing evidence. *In re A.S.W.*, 137 S.W.3d at 453. "Clear, cogent and convincing evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *Id.*

In his first point, Father contends the evidence was insufficient to support the termination of his parental rights under Section 211.447.4(2), for abuse and neglect. In his second point, Father challenges the sufficiency of the evidence to support the termination of his rights for failure to rectify conditions of a potentially harmful nature under Section 211.447.4(3). Because we find clear, cogent and convincing evidence in the record to support the termination on the ground of "failure to rectify," we need not address Father's first point.

To terminate parental rights under Section 211.447.4(3), commonly referred to by courts as the "failure to rectify" provision, the Juvenile Court is required to find: (1) that the "child has been under the jurisdiction of the [J]uvenile [C]ourt for a period of one year"; (2) "that the conditions which led to assumption of jurisdiction still persist, *or* conditions of a potentially harmful nature continue to exist"; and, (3) "that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, *or* the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." Section 211.447.4(3) (emphasis added); *see also In re B.J.K.*, 197 S.W.3d 237, 243 (Mo.App. W.D.2006). "Thus, as to the second and third required findings, there are two permissible alternative findings." *In re B.J.K.*, 197 S.W.3d at 243.

In determining whether to terminate parental rights for "failure to rectify," the Juvenile Court is required to consider and make findings on the following factors:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

Section 211.447.4(3). When applying Section 211.447.4(3), the ultimate issue is the continued existence of an unremedied, neglectful situation. *In re C.F.C.*, 156 S.W.3d at 430.

In this case, the Juvenile Court found that "[t]he children have been under the jurisdiction of the court for in excess of one year and the conditions leading to the assumption of jurisdiction or conditions of a potentially harmful nature, continue to

exist," and "continuation of the parent-child relationship ... greatly diminishes the children's prospects for early integration into a stable and permanent home." Further, the Juvenile Court found that "due to [Father's] lack of cooperation, [DFS] and the juvenile officer failed to aid [Father] in adjusting [his] circumstances to provide an appropriate home for the children." The Juvenile Court also found that "[Father] continued to lead [an] unstable or unknown lifestyle[ ]." Finally, the Juvenile Court found that Father's inability "to provide proper care, custody and control for the [ ] children is potentially harmful to said [ ] children should they be returned to that environment."

The record supports the Juvenile Court's determination that conditions of a potentially harmful nature still existed at the time of termination. As a result of Father's psychological evaluation, Dr. Schlessing recommended that Father receive psychiatric treatment and counseling to address the following problems: coping skills, anger and impulse control, empathetic skills, self-focus, frustration tolerance, consideration of others view points, domineering behavior, and marital relationship difficulties. Dr. Schlessing specifically identified Father's possible difficulties with anger control as a risk for the children. Dr. Schlessing explained that Father's poor impulse control may cause him to spank excessively.

The record shows that in failing to comply with his treatment plan and in failing to follow the recommendations of Dr. Schlessing, Father was unable to rectify conditions of a potentially harmful nature. This is made clear by the following testimony of Seaton, found to be credible by the Juvenile Court: Father derived his primary income from stealing; Father had physically assaulted his then girlfriend, Seaton, and threatened future violence;

Father viewed a website containing child pornography; Father made good on his threat to send a pornographic videotape to members of Seaton's family, including her fifteen-year-old son.

Also supporting the Juvenile Court's determination is Father's inappropriate relationship with his fourteen-year-old neighbor, F.W., which included exchanging letters, "romantic" kissing, and his touching her breasts and legs.

In addition to the testimony of Seaton and F.W., the record discloses that Father did not follow through with recommendations that he attend therapy and anger management counseling. Father did not complete a sexual offender's risk assessment. Initially, caseworkers did not attempt to make home visits due to concerns over Father's anger problems. When caseworker Ramos attempted home visits, Father never made himself available. Father did not consistently provide verification of employment, and he continued to have negative involvement with law enforcement.

■ We find that the termination of Father's parental rights for "failure to rectify" is supported by substantial evidence and is not against the weight of the evidence. However, in doing so, we do not ignore the following principle:

> [A] parent is not required to completely satisfy all aspects of a plan in order to avoid termination, so that a parent's failure to comply with one or more parts of a social service treatment plan does not, by itself, constitute a ground for terminating a parent's rights; rather it is merely a factor to consider under section 211.447.4(3). The issue is whether progress has been made in complying with the service agreements, not whether there has been full or substantial compliance.

*In re S.M.H.*, 160 S.W.3d 355, 368–69 (Mo. banc 2005) (internal citations omitted).

Here, Father did comply with his treatment plan in many respects, but he did not comply in those areas intended to address his issues with domestic violence, anger control, and sexual misconduct. Without addressing those issues, Father has failed to rectify conditions of a potentially harmful nature. Father's second point is denied. As set out above, we need not address Father's first point challenging the trial court's finding of abuse and neglect as a ground to terminate parental rights.

■ In Father's third point, he alleges that the trial court abused its discretion in finding that termination of Father's parental rights was in the best interest of the children. We disagree.

As previously set out, there is a two-step process involved in the termination of parental rights. "In addition to the requirement that the trial court find at least one statutory ground for termination, it is also necessary for the trial court to determine that the termination of rights is in the best interest[ ] of the children." *In re K.J.K.*, 108 S.W.3d 62, 68 (Mo.App. S.D.2003) (abrogated on other grounds by *In re M.D.R.*, 124 S.W.3d 469 (Mo. banc 2004)). The trial court's best interest determination is based on the totality of the circumstances. *Id.* It is the duty of the trial court to weigh the evidence presented relating to best interest and we will not reweigh that evidence. *Id.* The trial court's best interest determination is reviewed pursuant to an abuse of discretion standard. *Id.* The trial court abuses its discretion only when the ruling is clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.*

"As an aid in deciding best interest, the legislature, via [S]ection 211.447.6, provided a list of required findings to be made 'when appropriate and applicable to the case.'" *In re J.J.P.*, 113 S.W.3d 197, 203 (Mo.App. S.D.2003) (abrogated on other grounds by *In re M.D.R.*). However, such findings are not the only best interest considerations. *Id.* "This follows because 'best interest' is 'an ultimate conclusion based on the totality of the evidence presented.'" *Id.* (quoting *In re A.T.*, 88 S.W.3d 903, 909 (Mo.App. S.D.2002)).

"Section [211.477.6] leaves it to the trial court's discretion to make findings on the factors it deems applicable." *Id.* Here, the Juvenile Court made findings on the five factors, as follows:

(a) The bond between Father and the children was appropriate.

(b) Father maintained consistent visitation with the children.

(c) "[Father] did not provide financial support for the children[,]" except for occasional "items of in-kind support[.]"

(d) Father was "provided with extensive services subsequent to [the children] being taken into protective custody."

(e) "[F]ather has shown a disinterest in and lack of commitment to the ... children[,]" in that: "[F]ather [has] failed and/or refused to make those changes necessary to enable [him] to be a parent to the ... children[;]" "[F]ather [has] refused to consistently comply with services[;]" and "[F]ather has failed and refused to provide verification of residence and employment so as to enable the agency to determine whether [Father] can provide an appropriate home for the ... children."

We find that the evidence recounted in the facts portion of this opinion and in our "failure to rectify" discussion shows that the Juvenile Court's best interest findings are supported by a preponderance of the evidence. In failing to fully comply with his treatment plan, Father failed to address his problems with anger control, domestic violence and sexual misconduct. This conclusion is supported by the following: Father's continued negative involve-

ment with law enforcement; his continued acts of domestic violence; his improper relationship with a fourteen-year-old girl; and his providing a fifteen-year-old with pornographic materials.

The record shows that while Father has an interest in the children, he is not committed enough to change his lifestyle sufficiently to provide the children an appropriate home. *See In re J.J.P.*, 113 S.W.3d at 206. Based on the totality of the evidence presented, the Juvenile Court did not abuse its discretion in determining that the termination of Father's parental rights was in the best interest of the children. Father's third point is denied.

We conclude that the Juvenile Court's judgment was supported by substantial evidence, that it was not against the weight of the evidence and that there was clear, cogent and convincing evidence to support the termination of Father's parental rights.

The judgment is affirmed.

BARNEY, and LYNCH, JJ., concur.